**In re NORTHERN INDIANA OIL CO., Inc.,
FLETCHER v. SURPRISE.**

No. 9889.

United States Court of Appeals
Seventh Circuit.

Feb. 6, 1950.

As Amended on Denial of Rehearing
April 12, 1950.

Frederick F. Eichhorn, Gary, Ind., for appellant.

George Cohan, Gary, Ind., for appellee.

Before MAJOR, Chief Judge, KERNER and DUFFY, Circuit Judges.

MAJOR, Chief Judge.

This appeal is from an order in a bankruptcy proceeding, entered March 4, 1949, directing Robert B. Fletcher (hereinafter referred to as respondent) to turn over to Charles L. Surprise, the Trustee in Bankruptcy (hereinafter referred to as the Trustee) of the Northern Indiana Oil Company, Inc. (hereinafter referred to as Northern Indiana or the bankrupt), certain described personal property and certain enumerated leases by which respondent was in possession of real property described therein. The decree also directs that respondent account for and pay over to the Trustee the net profits realized by him from the conduct of a business wherein the property described in said leases was utilized from January 1, 1947 until the date of the consummation of the turn-over.

The issues in the court below were formulated by the Trustee's petition filed January 29, 1948, to direct respondent to turn over to the Trustee property described in Exhibit A attached to and made a part of the petition, together with respondent's answer thereto. Two issues are raised here: first, that the court was without summary jurisdiction to direct the turn-over, and second, that the order is erroneous on its merits.

The court below made extensive findings of fact, together with its conclusions of law, upon which its order is predicated. The findings in the main are not in dispute and give a fairly accurate picture of the situation. We know of no better way to state

the facts than to adopt the findings as made, with some subsequent explanation and the statement of some facts not disclosed in the findings. The court found:

"1. On January 15, 1945, the Northern Indiana Oil Company, Inc. (hereinafter called the bankrupt) was an Indiana corporation which was and had been engaged in the business of distributing petroleum products at wholesale; selling gasoline, oil, and auto accessories at retail; and operating automobile parking lots, all in the city of Gary, Indiana.

"2. On January 15, 1945, the bankrupt was operating five gasoline stations, six parking lots, and a bulk storage plant. These stations, parking lots, and bulk plant were being operated on lands which did not belong to the bankrupt, but which were under lease to the bankrupt from divers owners.

"3. On or about December 12, 1944, the Office of Price Administration issued an order or orders prohibiting the bankrupt from the further transfer, sale, or delivery of gasoline after January 15, 1945.

"4. On or about January 26, 1945, the bankrupt executed a certain 'lease with option to purchase', whereby its entire business, including the then-existing lease described in Finding 2, and all its other physical assets and property were leased or subleased to Robert B. Fletcher, effective as of January 15, 1945. This lease, designated Objector's Exhibit 8, is made a part of these special findings and incorporated herein by reference.

"5. Allegedly because of a typographical error, the lease provided for a $50 per month rental, but Fletcher paid $100 per month to the corporation until the bankruptcy, and he paid $100 per month to the Trustee from the time of his appointment through December, 1946.

"6. Fletcher did not demand or receive from the bankrupt a written list of names and addresses of the creditors of the bankrupt, nor did he at any time ever notify the creditors of the bankrupt of this transaction whereby he took possession of the entire business and physical assets of the bankrupt.

"7. An involuntary petition in bankruptcy was filed against the bankrupt on April 26, 1945. The schedules did not disclose the Fletcher lease. The Northern Indiana Oil Company, Inc., was duly adjudged a bankrupt on May 14, 1945. Charles L. Surprise was appointed the Receiver on April 28, 1945, and the Trustee on June 15, 1945.

"8. On October 10, 1945, the Trustee filed a petition with the Referee, asking permission to sell to Fletcher the items of personal property covered in the lease under the terms of the option contained in said lease. The Referee granted the petition but on review the Court reversed the Referee's holding and denied the petition to sell.

"9. Fletcher has continued to operate the parking lots, gasoline stations, and bulk plant and since January 15, 1945, has executed new leases between himself and the respective owners of the land where these gasoline stations, parking lots, and bulk plant are located.

"10. At no time subsequent to his appointment, did the Trustee give any oral or written notice to any of the lessors of the bankrupt that he intended to or did assume any of the leaseholds which the bankrupt held on May 15, 1945, and which it had sublet to Fletcher in the 'lease with option to purchase'.

"11. At no time since May 14, 1945, did the Trustee pay any rent on the leasehold properties described in the 'lease with option to purchase', but Fletcher has during that time paid the rent on these properties, except that location which he no longer operates. (See Finding 21.)

"12. The Trustee has never petitioned or been directed by the court to assume any of the leases described in the 'lease with option to purchase'.

"13. At the time the receiver was appointed, the bankrupt had no funds. In fact, its checking account at the Gary Trust and Savings Bank was overdrawn in the amount of $1,741.28.

"14. The income tax returns of the bankrupt corporation show net losses in 1937, 1938, 1940, 1941, 1943, and 1944, totaling $24,309.29; net profits for the years 1939

and 1942 totaling $5,640.84. The net loss for eight years' operation was $18,558.45.

"15. The Ohio Oil Company, through a representative, informed Mr. Surprise after his appointment as Trustee that it would not do business with him, as trustee. This company had supplied the bankrupt with the gas and oil which it had sold at retail.

"16. According to its books and records, the bankrupt ceased doing business on or about January 15, 1945;

"17. The only assets of the bankrupt other than those described in the 'lease with option to purchase' were merchandise of the value of $100 and the accounts receivable.

"[Finding 18 need not be incorporated, as it only sets forth the minutes of the Board of Directors of Northern Indiana, showing approval of the lease to Fletcher, with its terms and conditions.]

"19. Immediately after January 15, 1945, Fletcher changed the name of the business which he conducted under the 'lease with option to purchase' to 'R. B. Fletcher'.

"20. J. Ralph Snyder, president of the bankrupt corporation, contacted Robert B. Fletcher prior to January 15, 1945, in reference to the leasing of the assets of the bankrupt. Up to that time Fletcher had never been in the gasoline or fuel oil business.

"21. Robert B. Fletcher at this time does not operate Gas Station Number 3 listed in the 'lease with option to purchase'.

"22. The business which had been operated and conducted by the Northern Indiana Oil Company prior to January 15, 1945, and which was leased to Robert B. Fletcher on that date was worth approximately $20,000 on April 28, 1945. Its value has increased since that time.

"23. The conduct of Robert B. Fletcher as a lessee of the business assets of the bankrupt has resulted in his obtaining an unconscionable advantage of his corporate lessor and in his now asserting complete ownership of this business, less certain tangible assets, in his own right. Such advantage will not be recognized and it is found that the business of distributing petroleum products at wholesale, selling gasoline, oil, and auto accessories at retail, and operating automobile parking lots in the City of Gary, Indiana, which business is now being conducted by the respondent, Robert B. Fletcher, is properly the business of the bankrupt.

"24. Certain undetermined items of equipment now being used in the business conducted by Robert B. Fletcher, as found in Finding 23, are the true property of said Fletcher.

"25. The opinion below shall be considered part of the special findings of fact and is incorporated herein by reference."

As suggested in finding 25, the court filed an opinion which, as might be expected, is concerned in the main with the court's reasoning and legal principles which were applied. At no place does the court deal with the question of summary jurisdiction other than to state as a conclusion of law that it "has jurisdiction of the person of respondent, Robert B. Fletcher, and of the subject matter of the pending issue."

In the beginning it is well to keep in mind there is no dispute as to the personal property (referred to in finding 4 as "other physical assets and property") acquired by respondent under his lease with Northern Indiana under date of January 26, 1945, and which has since been possessed by him. Respondent has at all times been willing to turn this property over to the Trustee, which for reasons subsequently explained the latter refused to accept. The only properties, therefore, involved in the turn-over order which are in dispute are the leases which Northern Indiana had with the owners of such properties (finding 2), which were sub-let to respondent in his lease with Northern Indiana dated January 26, 1945. Thus, as to such leases the owners of the properties described therein were the lessors, Northern Indiana was the lessee, and respondent by virtue of his lease with the latter became the sub-lessee. The leases covering the property held by Northern Indiana which were sub-let to respondent were in the usual form and imposed many obligations and conditions upon Northern Indiana as lessee. We need not be concerned at this point with such conditions except to note that they were all for definite

periods of time which has long since expired, and which leases were renewed by respondent directly with the owners of the respective properties (finding 9).

The lease of January 26, 1945, between Northern Indiana and respondent required the latter to pay rental on the leasehold estates then possessed by Northern Indiana, by virtue of its leases with the owners. (These leases are sometimes referred to as the underlying leases.) The rentals which respondent thus obligated himself to pay and which he has continuously paid either according to the terms of the leases then in existence or in accordance with their terms as subsequently made directly with the owners, amount, as we calculate, to the sum of $1190.25 per month. The Trustee is strangely silent with reference to this obligation assumed and discharged by respondent. Respondent by this lease also agreed to purchase the stock of merchandise used in the conduct of the business at its inventoried wholesale price. This obligation he discharged to Northern Indiana. In addition, respondent was granted the right and option at any time during the period of the lease to purchase the property demised at its appraised value. The lease by its terms expired on January 14, 1946, with the privilege of renewal for a term of one year upon complying with certain prescribed conditions. While the lease provides a rental of $50.00 per month, the fact is that respondent paid Northern Indiana prior to bankruptcy $100.00 per month and continued to pay the Trustee the same amount from the time of his appointment through December, 1946 (finding 5). More will later be said concerning this circumstance as it relates to both of the questions raised on this appeal.

No contention is or has been made that this lease was fraudulent, although the court in its opinion reasons that a fiduciary relationship existed between Northern Indiana and respondent. This reasoning will be subsequently referred to. Northern Indiana was adjudicated a bankrupt on May 14, 1945, upon an involuntary petition filed against it on April 26, 1945. Charles L. Surprise (petitioner and appellee here) was appointed Trustee June 15, 1945 (finding 7). At that time and at all times since, respondent occupied the premises in question and during such time has admittedly been in actual open and notorious possession of the property described in his lease with Northern Indiana. Whether the Trustee at any time came into constructive possession of such property, as contended, either by the bankruptcy law or by the acts of the parties, will be subsequently discussed.

The Trustee was highly qualified and experienced as a business man as well as in the duties and obligations imposed upon a bankruptcy trustee. He had acted either in that capacity or as a state court receiver in over seven hundred estates, covering a period of forty years. Immediately upon his appointment he visited the place of business in controversy and found respondent in possession of all tangible assets as well as the real property leased by him from Northern Indiana. He asked for an inventory of the assets, which was furnished, and after a thorough investigation decided it would be unwise to take over and operate the business now asserted to have been that of the bankrupt. He did not affirm, adopt or assume either respondent's lease with the bankrupt or the underlying leases on the parking lots, filling stations or bulk plant, or in any manner take or attempt to take them over. On the other hand, he concluded that he should not do so. He never filed any written assumption of any of the leases nor did he affirmatively reject any.

At no time did the Trustee pay rent on any of the properties originally leased to the bankrupt which respondent by his lease was obligated to and did pay, nor did the Trustee employ respondent in the conduct of any business either on his own behalf or that of the bankrupt, nor was he ever directed by the court to assume or adopt any leaseholds, nor did he ever make demand upon respondent for the possession of any of the property described in his petition for turnover filed January 29, 1948. The record makes it crystal clear that the Trustee regarded this alleged property of the bankrupt, occupied and possessed by the respondent, as a dead horse. He testified:

"Q. What was your decision as to whether or not you should personally at-

tempt, as Trustee, to take over and operate the former business? A. I decided that it would be unwise for me to attempt to take over or operate this business.

"Q. Did you feel you could not have come before a court and asked authority to borrow money for that purpose? A. Yes.

"Q. Was that based upon your conclusion as to whether it could be operated at a profit or loss? A. Yes.

"Q. What was your conclusion in that respect? A. That I could not operate it at a profit if the incorporators of it could not do it.

"Q. State whether or not you affirmed any of the leases as to parking lots or filling stations? A. No, I did not.

"Q. Did you in any manner take over any of those lots? A. I did not."

Not only that, but the record discloses that the Trustee stoutly resisted any and all efforts to require him to take over these claimed assets of the bankrupt. Typical of the Trustee's attitude in this respect (also shown in numerous other ways) was his response to a petition filed November 21, 1945 by certain creditors, in which it was alleged that the leasehold estates and other property were valuable and that the Trustee should be directed to take over such properties on the theory that the bankrupt was the equitable owner thereof. The Trustee, in his response to such petition filed December 11, 1945, reviewed in detail the information which he had acquired by reason of his investigation, and among other things stated, "This Trustee and his said attorney then came to the conclusion that it would be unwise and detrimental to the estate to take over the operation of the said business inasmuch as the books of the bankrupt and of said Robert B. Fletcher, the Lessee, showed clearly that the business had been conducted and was being conducted at a loss, and that the rents, taxes, insurance and other expenses, as a whole, exceeded the income of the said filling stations and parking lots," and further, "That immediately after his appointment as Receiver, he called upon said Fletcher for the various leases and obtained such leases as were in writing and took them to his attorney for examination. That said Trustee and his attorney thereupon ascertained that the written leases with the Ohio Oil Company contained clauses providing for their cancellation in the event of a bankruptcy proceeding, and that the other written leases, and also the verbal leases, were all upon a month to month basis, and that the further investigation by the Trustee led him inescapably to the conclusion that if he, as Trustee, attempted to take over said leasehold interests the respective landlords would have cancelled all of said leases. That in addition thereto, this trustee carefully and fully investigated the history and the background of the respective parcels of real estate covered by said leases, and came to the conclusion that it would be unwise and detrimental to this estate to attempt to assert title, either legal or equitable, to any of the said real estate, and that the possibility of succeeding in establishing an interest in said real estate was extremely remote, if not impossible."

This dismal picture of the business and the value of the assets as painted by the Trustee at that time is in marked contrast to the glowing terms now employed as to its worth and value. Then the Trustee thought it was worthless; now it is claimed to have a value of from fifty to one hundred thousand dollars. Even though the contention as to its present value be accepted, we do not see how that is material to the question as to whether the Trustee acquired any title or interest in the leasehold estates represented by the underlying leases. It neither excuses nor justifies his positive refusal to take over or attempt to do so, the interests represented thereby. True, the court found (finding 22) that the property at the time it was taken over by respondent was worth "approximately $20,000." That figure apparently is based upon the testimony of an expert witness who in fixing its value at that time attached much weight to its subsequent operation and its increased value.

At any rate, this testimony and this finding is contrary to the judgment of an informed Trustee who at that time thought it had no value to the estate, and it is difficult to believe other than that the Trustee's

judgment was sound. Northern Indiana for the eight years previous to its leasing the properties to respondent had a net operating loss of $18,558.45 (finding 14). It had become involved with the Office of Price Administration and had an order prohibiting it from the "further transfer, sale or delivery of gasoline after January 15, 1945." These items were its chief stock in trade, and with this restraint its effort to operate either at a profit or a loss were completely stymied. And when the business was taken over by respondent, he was met with and solved numerous difficulties arising by reason of unpaid rentals on the underlying leases, with taxes due and unpaid and other debts accompanied by liens of various sorts. More than that, as the Trustee recognized, the foundation upon which this business rested at the time of bankruptcy, as presently, was the underlying leases. Northern Indiana neither at the time of its lease with respondent nor at the time of bankruptcy owned any fee interest in any of these properties and, of course, respondent as lessee acquired no such interest. Such leases were all for a specified term and some were of short duration. Some of them contained a provision by which the lessors had a right of forfeiture upon Northern Indiana's adjudication in bankruptcy. Thus, the foundation of this business was dependent upon the sufferance of the property owners, landlords in the underlying leases, susceptible of being demolished at their will and the business destroyed. In this view of the situation, it is not difficult to visualize why the Trustee was opposed to taking over and it makes us wonder how it could be of any substantial benefit to the estate if that was done at the present time, as the court has ordered. None of the owners of these various properties, landlords in the underlying leases, are parties to the instant proceeding and there is nothing to indicate that they would agree or be willing to lease their properties to the Trustee or to a person to whom he might sell or assign.

Thus, it is undisputed that the Trustee refused to assume either the lease between the bankrupt and respondent or those between Northern Indiana and other parties. In fact, the District Court, in a decision rendered April 8, 1946 in this same proceeding, so held insofar as the personal property was concerned. In re Northern Indiana Oil Co., Inc., D.C., 65 F.Supp. 167, 168. There, the court stated: "* * * there is nothing in the record of the proceedings to indicate that the Trustee received authority from the Referee to assume the contract."

This brings us to a consideration of Sec. 70, sub. b of the Bankruptcy Act, 11 U.S.C.A. § 110, sub. b, with which the Trustee admittedly failed to comply. It is argued here that the failure of such compliance is only a technical obstacle, but in our opinion it goes to the heart of the controversy. Rather than cite and quote from numerous cases, we shall rely upon Collier on Bankruptcy (14th Edition), Vol. 4, Sec. 70.42, commencing on page 1215, which sets forth the rights and duties imposed upon a Trustee by this section of the Bankruptcy Act, together with authorities in support of the propositions enumerated. It is stated (page 1216): "The bankrupt's estate, with all the liabilities attached, does not pass to the trustee *en bloc*, definitely and irrevocably. With respect to one important category of assets—namely, executory contracts—the transfer does not operate until the contract has been definitely adopted."

On page 1223: "Abandonment of an asset by the trustee divests the trustee of his title. This loss of title is irrevocable—that is, no unforeseen subsequent enhancement in the value of the abandoned asset will allow the trustee to reclaim the property for the benefit of the estate.

"The divestment of the trustee is the necessary corollary of the bankrupt's revestment. * * * Once the property has been abandoned, the trustee may no longer withhold its possession from the bankrupt, such as by keeping it in the custody of the court."

On page 1230: "But § 70b gives the trustee an option to substitute himself for the bankrupt by 'assuming' the contract. It makes it his duty within a prescribed period of time either to assume or reject, without, however, attaching any immediate sanction to a failure to elect except the opera-

tion of a conclusive statutory presumption that such failure amounts to a rejection."

On page 1234: "Assumption of a contract is an act requiring notification of the party concerned. The trustee cannot assume merely in his own mind."

On page 1236: "It is the main purpose of § 70b to clarify at the earliest possible moment the mutual relations of the contracting parties. Hence if the trustee rejects or is deemed to have rejected a contract, the other party is entitled to rely upon the rejection and to act accordingly."

And particularly as to leases the author on page 1237 stated: "Leases, if unexpired at the date of the filing of the petition, are 'executory' contracts and therefore subject to the provisions of § 70b dealing with such contracts, no matter whether the bankrupt is the lessee or the lessor."

On page 1242: "The title to the lease does not pass to the trustee by operation of law upon his appointment and qualification, but only upon the affirmative act of adoption, which in turn relates back to the date of the filing of the petition."

It might not be amiss also to cite and quote from a few of the cases as to the effect of the failure of a Trustee to adopt executory contracts. In In Re McCroy Stores Corporation et al., 2 Cir., 69 F.2d 517, 518, the court quotes with approval, "Any right of the trustee in the leasehold was not a title thereto, but an option to acquire title if acquisition should seem to the trustee best for the estate." In Green v. Finnigan Realty Co., 5 Cir., 70 F.2d 465, 466, the court stated, "But the right of a receiver or a trustee in bankruptcy within a reasonable time to reject the leasehold results after its exercise in disconnecting him entirely from the lease. He thereafter neither holds nor holds over as a tenant under it." And in Palmer et al. v. Palmer et al., 2 Cir., 104 F. 2d 161, 163, the court stated, "A lease, being property cum onere, does not pass to a trustee in bankruptcy, unless he adopts it."

An application of these principles leads irresistibly to the conclusion, so we think, that no interest or title which the bankrupt had in the leasehold estates passed to the Trustee. Sec. 70, sub. b, of course, provided a means by which the Trustee could have acquired such interest or title, but by failure to act he relinquished whatever right or claim he otherwise would have had. The Trustee places reliance, and it appears the court below did likewise, upon the provision in Sec. 70, sub. b, "Unless a lease of real property shall expressly otherwise provide, a rejection of such lease or of any covenant therein by the trustee of the lessor shall not deprive the lessee of his estate." This contention, in our view, is beside the point. The provision is designed to protect the lessee as against the lessor when and if the Trustee fails to adopt the lease. It is of no benefit to a Trustee who has failed to adopt within the time which the section prescribes.

The court below emphasizes that there was a confidential relationship between the bankrupt and the respondent. As to the latter the court stated: "* * * he cannot in good conscience renew and maintain the lease in his own name, and equity will intercede to impose a constructive trust upon the lease in favor of the sublessor." And the court found (finding 23) that the business being conducted by respondent "is properly the business of the bankrupt." Even though such be the situation—that is, that there was a confidential relation between the bankrupt and the respondent and even though the latter was merely the alter ego of the former—it is not discernible how this would be of any benefit to the Trustee. This is demonstrable by assuming that no dealings had taken place between Northern Indiana and respondent and that the former at the time of its adjudication had been in control and possession of all the property, both leasehold interests and personal property, described in its lease to respondent. Under such assumed situation the bankrupt's interest in the leasehold estates would not have passed to the Trustee unless and until the leases were adopted by him. And it is not apparent how the Trustee is in any better position from the fact that the possession of such property was prior to bankruptcy transferred to respondent as lessee.

Thus, we have a situation where the Trustee has at no time had either title or possession of the leasehold estates but where their possession at least has been in respondent. Furthermore, the Trustee from a date sixty days after the bankrupt's adjudication has been without right to acquire either possession or title to any of the leasehold estates. This would seem to be sufficient to dispose of this appeal, but there is another matter upon which the Trustee places much reliance and which should not go unnoticed.

This other matter is based upon the fact that respondent paid to the Trustee $100 per month in rental, the same as he had paid to the bankrupt before adjudication (finding 5). As we understand, the contention is that such payment to the Trustee was a recognition of the latter's ownership of all the property acquired by respondent from Northern Indiana, which respondent is now estopped to deny. Passing the dubious question as to how respondent could recognize a right in the Trustee which never existed, we think the contention rests upon a fallacious premise. The record indicates that the rental paid by respondent to Northern Indiana prior to bankruptcy was only for the personal property described in the lease. But in any event the record clearly shows that the $100 per month which respondent paid to the Trustee was for the use of personal property and that it had nothing to do with any property right or interest which either the bankrupt or respondent had as a result of the underlying leases, and there is nothing in the court's findings contrary to this view (finding 5). At the hearing the Trustee testified:

"Q. State to the court the arrangement under which Mr. Fletcher is in possession, the arrangement between you and Mr. Fletcher, if there be one. A. At the time of my appointment, Mr. Fletcher was claiming to be in possession under a lease with option to purchase, which expired in a year. During that year he paid me $100 a month rental, which was principally for the oil trucks, as he admitted he was unable to buy any oil trucks in the condition of the market, and he had to have them."

Following, the Trustee testified that respondent continued to pay rent until "he wrote me a letter saying he would no longer pay $100 a month, and he asked me to remove my property from his possession." He further testified, "There is no controversy over a single item; in fact, to this day he [respondent] insists I take them out," and then:

"Q. In other words, this $100 a month, during the period you received it, was for the trucks and tangible assets? A. Yes, including the use of the desks in the office; principally, the trucks and a few desks in the office that he was using.

"Q. But it was not any rent for the parking lots, or things of that sort? A. That is right."

Furthermore, the Trustee, in his answer to objections entered by certain creditors to the sale of personal property stated: "That, as aforesaid, this Trustee has been, since the time of his appointment as such, receiving the sum of One Hundred ($100.00) Dollars from said Robert B. Fletcher as rental for the use of said personal property and to date has received the sum of Eighteen Hundred ($1,800.00) Dollars cash in said rentals; that by virtue of renting said personal property to said Fletcher, this Trustee has released and relieved himself from the expenses of a warehouse for said personal property and of employing a watchman therefor; that no dispute or controversy of any nature whatsoever exists between this Trustee and the said Robert B. Fletcher as to the right of possession of said personal property, and that said Robert B. Fletcher does not deny the right of this Trustee to the possession and control of any of said personal property and that no reason or cause whatsoever exists for this Trustee to 'seize' any of the said personal property from said Fletcher, for the reason that said Fletcher will at any time deliver up the possession thereof upon the request of this Trustee."

The payment of this monthly rental to the Trustee indicates. nothing more than that respondent thought the Trustee was entitled to take over the personal property. An even stronger indication, of course, is the fact that respondent from the beginning offered and still offers to turn it over to the Trustee, and that this personal property is not now a matter of dispute is due to respondent's willingness , in this respect. Whether respondent was under any legal obligation either to pay rent on the personal property or to turn it over to the Trustee is now of no consequence. In any event, respondent at all times denied that the Trustee had any right or interest in the leasehold estates and respondent's position in this respect was acquiesced in by the Trustee by his refusal to adopt the leases. Respondent managed and paid all expenses in the conduct of the business, including some $1200 per month to the lessors in these underlying leases. The Trustee paid nothing and did nothing in face of the statutory requirement that he affirm the leases as a prerequisite to the acquirement of an interest therein. Under the circumstances it would appear that any estoppel might be more appropriately invoked against the Trustee than the respondent.

We reiterate that the leasehold estates now in dispute do not exist by reason of leases transferred to respondent by Northern Indiana. When those leases expired, either by their terms or otherwise, new leases were made between the owners of the property and respondent. This all took place long before the filing of the petition in the instant matter. These numerous landlords are not now and never have been parties to the bankruptcy proceeding, and we see no reason why they were not at liberty, upon the expiration of their leases with Northern Indiana, to again lease their properties as they saw fit. As is stated by Collier, supra, "Hence if the trustee rejects or is deemed to have rejected a contract, the other party is entitled to rely upon the rejection and to act accordingly." And certainly if the business was to survive, it was a matter of necessity that new leases be made because, as noted, these leasehold estates constituted the foundation upon which the business rested.

The Trustee's main argument in support of summary jurisdiction is that the relation of landlord and tenant existed between the Trustee and respondent and, such being the case, that respondent as tenant is estopped to deny the title of the Trustee, his landlord. The premise upon which this argument rests, as we have shown, is not sound and the argument predicated thereon is without merit. Other circumstances concerning respondent's transactions with the Trustee are cited as a basis for the argument that respondent has waived his right to object to summary jurisdiction. We have examined the record in respect to these contentions and we think they are likewise without merit.

As already noted, the Trustee never at any time had either actual or constructive possession of the leasehold estates. Such possession was at all times in respondent. That such possession was adverse and his claim to title more than colorable is hardly open to question. More than that, respondent's possession and claim to title was predicated upon leases with the owners of the property, none of whom were notified or made parties in the instant proceeding. Under such circumstances, the court was without summary jurisdiction. See Taubel–Scott–Kitzmiller Co., Inc. v. Fox et al., 264 U.S. 426, 432, 44 S.Ct. 396, 68 L.Ed. 770; Harrison, Trustee v. Chamberlin, 271 U.S. 191, 193, 46 S.Ct. 467, 70 L.Ed. 897; In re Goldstein et al., 7 Cir., 216 F. 887, 888; Matter of Chicago & North Western Ry. Co., 7 Cir., 86 F.2d 508, 509. What we have said must be considered as relating solely to the matter of jurisdiction, and is without prejudice to the right of the Trustee to litigate the matter on its merits in an appropriate action instituted in a proper forum.

The order appealed from is reversed and the cause remanded, with directions that the Trustee's petition be dismissed for want of jurisdiction.