**In re Henry Thomas TAYLOR, Debtor.**

**Bankruptcy No. 94–73715–W.**

United States Bankruptcy Court,
D. South Carolina.

May 3, 1996.

Julio E. Mendoza, Jr., Columbia, SC, Trefor Thomas, Myrtle Beach, SC, for Debtor.

Grady L. Patterson, III, Columbia, SC, William Short, Jr., Columbia, SC, for Magnolia Entities.

## ORDER

JOHN E. WAITES, Bankruptcy Judge.

THIS MATTER comes before the Court upon the *Motion for Authorization to Sell Real and Personal Property Comprising Nursing Home Facilities Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* (the "Motion") filed on January 16, 1996 by Henry Thomas Taylor, the Debtor and Debtor-in-Possession in this case ("Taylor"). In the Motion, Taylor proposes to sell the real and personal property that he owns comprising five nursing home facilities to Delta Health Group, Inc. for the sale price of $17 million. On February 16, 1996, Taylor amended the Motion to state that the sale is not a cash sale, to identify the purchaser as "Delta Health Group, Inc. or its assigns" (hereinafter, Delta Health Group, Inc. and "its assigns" shall be referred to together as "Delta"), and to provide the material terms of the sale, which are stated in the copy of the "Term Sheet" between Taylor and Delta attached to the amendment. At the initial hearing on the Motion on March 11, 1996, Taylor presented the executed *Agreement for Purchase and Sale* (the "Agreement").

Taylor originally proposes to sell the five nursing home facilities to Delta upon the following terms: Delta will assume the mortgage on the properties held by LTC Properties, Inc. ("LTC") in the approximate amount of $11,250,000.00; Delta will pay $1 million cash to Taylor at the closing of the sale; Delta will execute its note ("Note No. 1") payable to Taylor in the amount of $1 million due on April 10, 1997 and bearing interest at the rate of five percent per annum; and Delta will execute a promissory note ("Note No. 2") to Taylor for the balance of the purchase price (approximately $3,750,000.00), which note will be on a twenty-year term with interest at the rate of seven percent per annum for the first six years of the note and interest at the rate of five percent per annum for the remaining fourteen years of the note. Delta South Carolina, Inc., a corporation recently formed, would be the purchaser of the properties, and its stock would be pledged to secure the two notes to Taylor.[1] The Agreement between Taylor and Delta also provides that Taylor and Delta will enter into contracts by which Taylor will be allowed to operate a pharmacy business and a therapy business for the five nursing home properties; provided, however, that Delta may exercise an option under the Agreement to terminate the pharmacy contract with Taylor, in which case the interest on Note No. 2 will remain at the rate of seven percent per annum for the final fourteen years of the note, and Note No. 2 will be subject to a prepayment charge of $250,000 if prepaid in full within twelve years after the closing of the sale to Delta.

Taylor seeks authorization for the sale, first, under 11 U.S.C. § 363(b)(1)[2] as a sale not in the ordinary course of business, without a confirmed plan of reorganization, and, second, under § 363(f) as a sale free and clear of the asserted interests of Magnolia Manor–Spartanburg, Inc., Magnolia Place, Inc., Magnolia Manor–Rock Hill, Inc., Magnolia Manor–Greenwood, Inc. and Magnolia Manor–Moncks Corner, Inc. (the "Magnolia Entities" or "Magnolia"), which assert leasehold interests in the five nursing home properties. Taylor asserts that the sale free and clear of the asserted interests of the Magnolia Entities is proper pursuant to § 363(f)(4),

---

1. Taylor and Scott Bell, President of both Delta Health Group, Inc. and Delta South Carolina, Inc., testified that this arrangement is made because the terms of the LTC loan prohibit the granting of a second mortgage on the properties.

2. Hereinafter, all references to provisions under the United States Bankruptcy Code, 11 U.S.C. §§ 101, *et seq.*, shall be by section number only.

on the basis that the asserted interests are in bona fide dispute, and further, that if authorization is not granted under § 363(f)(4), authorization for the sale free and clear of the asserted interests is proper under § 363(f)(3), on the basis that the sale price is greater than the aggregate value of all liens on the properties.[3] As a provision of the sale free and clear of the asserted lessee interests, Taylor requests that, to the extent that the Magnolia Entities possess enforceable interests in the properties, such asserted interests shall attach to the proceeds of sale.

The Magnolia Entities[4] object to the proposed sale on numerous grounds. Several of the objections may be deemed "preliminary" matters: that this Court does not have jurisdiction to rule upon Taylor's Motion; that Taylor has not given proper notice of the proposed sale; that a leasehold "estate" is not subject to the provisions of § 363(f); and that Taylor's exclusive remedy as the lessor of the properties is under § 365. The Magnolia Entities also state objections relating to the merits of the sale: that the Debtor does not meet the requirements of the sound business purpose test to support a sale under § 363(b)(1); that applicable non-bankruptcy law would not permit the sale free and clear of the asserted interests of the Magnolia Entities;[5] that the proposed sale to Delta cannot be made pursuant to § 363(f)(3); that the interests of the Magnolia Entities are not in dispute; that Taylor is attempting to sell assets that are not property of the bankruptcy estate; that there is no pending plan of reorganization; and that the sale is not in the best interests of the bankruptcy estate. Finally, the Magnolia Entities state as objections, that they are entitled to receive adequate protection for their personalty not included in the notice of sale, and that they are entitled to exercise a right of first refusal under the leases.

The Court conducted a hearing on the Motion on March 11, and 12 and April 17, 1996. Based upon the evidence and testimony produced at the hearing in this matter, including the filings, documents and orders entered in other matters in this case which were incorporated into the record in this matter, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

1. Taylor filed a petition for relief under Chapter 11 of the Bankruptcy Code on August 3, 1994.

2. At the time of the filing of his Chapter 11 petition, Taylor owned four nursing home properties consisting of the following:

 a. A 106–bed nursing home facility located at 107 Murray Drive, Rock Hill, South Carolina, which Taylor refers to as "Magnolia Manor" and the Magnolia Entities refer to as "Magnolia Manor–Rock Hill";

 b. A 95–bed nursing home facility located at 375 Serpentine Drive, Spartanburg, South Carolina, which Taylor refers to as "Pinewood Manor" and the Magnolia Entities refer to as "Magnolia Manor–Spartanburg";

 c. An 88–bed nursing home facility located at 1415 Parkway Drive, Greenwood, South Carolina, which Taylor refers to as "Greenbrook Manor" and the Magnolia Entities refer to as "Magnolia Manor–Greenwood"; and

3. In his Motion, Taylor also cites § 363(f)(1) as additional authority for the sale, which authorizes a sale free and clear of an interest if applicable non-bankruptcy law would authorize the sale. However, Taylor states that he cited § 363(f)(1) only to reserve his right to later pursue such authorization, if necessary and appropriate, and that he does not request authorization for the sale under this provision at this time. Accordingly, the Court will not address this provision since authorization is not sought under it.

4. Magnolia Manor–Inman, Inc. is listed as one of the parties objecting to the Motion with the other

Magnolia Entities. The Magnolia Entities and Magnolia Manor–Inman, Inc. are all subsidiaries of The Magnolia Group, Inc., which is owned and controlled by Terry L. Cash. Hereinafter, references to the "Magnolia Entities" or "Magnolia" shall include Magnolia Manor–Inman, Inc.

5. This objection is to address § 363(f)(1). Since Taylor states that he does not request authorization under § 363(f)(1) for the sale to Delta, the Court will not address this objection in this order.

d. An 88-bed nursing home facility located at 8020 White Avenue, Spartanburg, South Carolina, which Taylor refers to as "Hilltop Manor" and the Magnolia Entities refer to as "Magnolia Place".

3. At the time of the filing of his Chapter 11 petition, Taylor also owned all of the stock of Berkeley Nursing Home, Inc. ("Berkeley"), a subchapter S corporation. Berkeley owned a 132-bed nursing home facility located at 505 South Live Oak Drive, Moncks Corner, South Carolina, which Taylor refers to as "Berkeley Manor" and the Magnolia Entities refer to as "Magnolia Manor–Moncks Corner". On January 11, 1996 this Court entered its Order authorizing Taylor to exercise his shareholder rights to dissolve Berkeley and to cause it to convey its assets, including the Moncks Corner property, to Taylor's bankruptcy estate, as a matter not in the ordinary course of business under § 363(b)(1). Taylor states that the Moncks Corner property has been conveyed to his bankruptcy estate.

4. The five nursing home properties described in Paragraphs 2 and 3 above are the five nursing home facilities that Taylor proposes to sell.

5. Taylor also owns certain equipment, beds, furnishings and other items of personal property relating to the use of the five nursing home properties which he includes in the proposed sale.

6. At the time of the filing of Taylor's bankruptcy case, the nursing home properties were subject to the following secured claims:

a. Wachovia Bank of South Carolina, N.A. ("Wachovia") held a first mortgage on the Magnolia Manor property, securing a loan with a balance of approximately $1,532,000.00, as estimated by Taylor in the Motion;

b. Wachovia held a first mortgage on the Greenbrook Manor property, securing a loan with a balance of approximately $1,458,000.00, as estimated by Taylor in the Motion;

c. Circle Business Credit, Inc. held a security interest in and lien on the furnishings, machinery and equipment in the Greenbrook Manor nursing home property, securing a loan having a balance of approximately $200,000.00, as estimated by Taylor in the Motion;

d. Eugene B. Fallaw held a second mortgage on the Magnolia Manor property, securing a loan having a balance of approximately $265,000.00, as estimated by Taylor in the Motion;

e. NationsBank, N.A. ("NationsBank"), successor to Rock Hill National Bank, held a first mortgage on the Hilltop Manor property, securing a loan having an approximate balance of $1,440,000.00, as estimated by Taylor in the Motion;

f. American Federal Savings Bank held a second mortgage on the Hilltop Manor nursing home property, and a security interest in and lien on the furnishings, machinery and equipment in the Hilltop Manor nursing home property, securing a loan having a balance of approximately $128,000.00, as estimated by Taylor in the Motion;

g. Branch Banking and Trust Company of South Carolina ("BB & T") held a first mortgage on the Berkeley Manor property, securing a loan having a balance of approximately $2,275,000.00, as estimated by Taylor in the Motion;

h. BB & T held a first mortgage on the Pinewood Manor property, securing a loan having a balance of approximately $1,400,000.00, as estimated by Taylor in the Motion;

i. BB & T held a second mortgage on all of the nursing home properties, and a lien on the furnishings and equipment of the nursing home properties, securing a loan having a balance of approximately $510,000.00, as estimated by Taylor in the Motion; and

j. BB & T held a third mortgage on all the nursing home properties, and a lien on the furnishings, machinery and equipment of the nursing home properties, securing a loan having a balance of approximately

$620,000.00, as estimated by Taylor in the Motion.[6]

7. The Magnolia Entities' asserted interests in Taylor's nursing home properties arise under certain lease agreements entered on or about April 1, 1993, as follows:

 a. Magnolia Manor–Moncks Corner, Inc. leased the nursing home real property in Moncks Corner, South Carolina from Berkeley;

 b. Magnolia Manor–Rock Hill, Inc. leased the nursing home real property in Rock Hill, South Carolina from Taylor;

 c. Magnolia Manor–Spartanburg, Inc. leased the nursing home real property at 375 Serpentine Drive, Spartanburg, South Carolina from Taylor;

 d. Magnolia Manor–Greenwood, Inc. leased the nursing home real property in Greenwood, South Carolina from Taylor; and

 e. Magnolia Place, Inc. leased the nursing home real property located at 8020 White Avenue, Spartanburg, South Carolina from Taylor.

8. Magnolia Manor–Moncks Corner, Inc., Magnolia Manor–Rock Hill, Inc., Magnolia Place, Inc., Magnolia Manor–Greenwood, Inc. and Magnolia Manor–Spartanburg, Inc. assumed possession of the leased properties on April 1, 1993 and are in possession of the nursing home facilities at this time. The lease terms have commenced and as they are for a number of years, they are unexpired.

9. Beginning around November 1993, a dispute arose between Taylor and the Magnolia Entities relating to payments that Taylor maintained were due to him under the leases and certain alleged non-compete agreements. For the first seven months after execution of the leases, the Magnolia Entities made payments to Taylor in the monthly amount that he claimed due under the leases and the alleged non-compete agreements. Beginning in November 1993, the Magnolia Entities reduced the payments that they paid to Taylor.

10. The leases provide, in Section Eight of each of the leases, that, "LESSEE agrees to deposit with LESSOR, on a monthly basis, an amount equal to $\frac{1}{12}$ of the prior year's property taxes to be applied toward payment of the property taxes." With the exception of the Pinewood Manor property in Spartanburg, South Carolina, the Magnolia Entities have not paid the tax escrow amounts to Taylor; instead, they have established an escrow account of their own and paid all taxes due in a timely manner.

11. Taylor testified that he first notified the Magnolia Entities in May 1993, that the failure to place the tax escrow accounts with him was a breach of the leases, then again in late 1993, and in January 1994. Terry L. Cash, the principal of the Magnolia Entities ("Cash"), testified that he was not aware of Taylor's position on the matter of the tax escrow account, and that he regarded the maintenance of the tax escrow account by the Magnolia Entities to be by agreement of the parties, but would escrow those funds with the Debtor if so requested. In January 1994, Taylor commenced action in state court against the Magnolia Entities, asserting the failure to make the tax escrow payments to him as a default under the leases.[7] In litigation before this Court, Taylor also has asserted that the Magnolia Entities' failure to make the tax escrow payments to him is a default under the leases. As of the date of the hearing on the Motion, the Magnolia Entities still maintain the tax escrow accounts in their own names.

12. Shortly after the commencement of this case, on August 19, 1994, Taylor filed with

---

6. In the Motion, and in the memorandum supporting the Motion, Taylor states that the above-shown estimated loan balances were derived from information that he obtained earlier in the case. It appears that these loans were paid prior to the hearing in this matter, and the actual amounts due at the time of payment were not presented to the Court. These estimated balances are shown only to provide an approximation of the amounts due on these secured claims, and these estimated amounts do not represent findings by this Court on the actual amounts due for each of these claims.

7. At the time Taylor filed his bankruptcy petition, the state court actions had not been adjudicated. Following the filing of the litigation in this Court over the leases (Adversary Proceeding No. 94–8202), the parties voluntarily dismissed these state court actions.

this Court his *Complaint Seeking Declaratory Judgment,* in Adversary Proceeding No. 94–8202. In that action, Taylor, Berkeley and Service Management, Inc., as plaintiffs, sought a determination that certain leases and non-compete agreements are valid, enforceable contracts and that the annual sum of money to be paid by the Magnolia Entities to the plaintiffs under the leases and non-compete agreements is $2,055,000.00.

13. In their answer to the complaint in Adversary Proceeding No. 94–8202, the Magnolia Entities also asserted that the leases are valid, but they asserted that the rent due under the leases is at a lower rate than claimed by Taylor, that the parties never entered into the non-compete agreements, and that, by way of counterclaim, the Magnolia Entities are owed certain sums that they paid on behalf of Taylor, Berkeley and Service Management, Inc. after taking possession of the properties.

14. On May 26, 1995, the Court entered its Order and Judgment in Adversary Proceeding No. 94–8202. In the Order and Judgment, the Court ruled as follows:

 a. The lease agreements, and the assignment of the lease between Service Management, Inc. and Magnolia Manor–Inman, Inc., are valid and enforceable agreements between the parties to such documents; [8]

 b. The amount of the rent to be paid under the leases is the rent calculated based upon the Medicaid cost of capital known to the parties at the time of the signing of the leases on April 1, 1993. This rental rate is to be based upon the cost of capital as reflected on plaintiffs' Exhibit 122 in Adversary Proceeding No. 94–8202; [9]

 c. The use of the equipment in the nursing home properties, which the Court defined to include equipment, beds, furnishings, and other items of personal property on the leased premises, is not included in the leases;

 d. Taylor's alleged non-compete agreements, the plaintiffs' alleged binder agreement or side agreements, and the Magnolia Entities' alleged side agreement(s) were not agreed to, nor entered into, by the parties, and do not constitute valid and enforceable agreements between the parties; and

 e. The Magnolia Entities were granted judgment against Taylor in the amount of $56,370.81, against Berkeley in the amount of $8,285.30, and against Service Management, Inc. in the amount of $324,884.96 plus an amount equal to the pro rata portion of the business license on the account of Moncks Corner due for the period prior to April 1, 1993.

15. On June 5, 1995, the Magnolia Entities filed their *Notice of Motion and Motion to Amend and Make Additional Findings and to Alter or Amend Judgment,* in Adversary Proceeding No. 94–8202, concerning the Order and Judgment entered on May 26, 1995. On July 24, 1995, the Court entered its Order and Judgment denying the motion.

16. On July 10, 1995, Taylor filed his *Notice of Appeal of the Order and Judgment* in Adversary Proceeding No. 94–8202, pursuant to which he has appealed certain of the Court's rulings made in the Order and Judgment entered on May 26, 1995.

17. On July 20, 1995, the Magnolia Entities filed their *Notice of Appeal,* in Adversary Proceeding No. 94–8202, pursuant to which they have appealed certain of the Court's rulings in the Order and Judgment entered on May 26, 1995.

18. Following the entry of the Order and Judgment in Adversary Proceeding No. 94–8202, Taylor commenced eviction actions against the Magnolia Entities in state court, and actions to recover certain per-

---

8. In ruling that the leases are "valid and enforceable", the Court did not rule upon issues of default or termination, which were not presented to the Court for adjudication in Adversary Proceeding No. 94–8202. The Court ruled that the leases are valid and enforceable according to their terms.

9. Based upon this calculation, the lease payments due to Taylor total $121,718.68 per month, or an aggregate of $1,460,624.15 per year.

sonal property used in the nursing homes, also in state court. On July 3, 1995, the eviction actions were removed to this Court, where they were assigned Adversary Proceeding Nos. 95–8157, 95–8158, 95–8159, 95–8164 and 95–8168, and later consolidated into one adversary proceeding under Adversary Proceeding No. 95–8157. The actions to recover the furnishings, equipment and other personalty were also removed to this Court and assigned Adversary Proceeding Nos. 95–8205, 95–8206, 95–8207, 95–8208, 95–8209, 95–8210 and 95–8225, and later consolidated under Adversary Proceeding No. 95–8205. As such, two adversary proceedings are now pending before the Court: Adversary Proceeding No. 95–8157, consisting of Taylor's eviction actions against the Magnolia Entities; and Adversary Proceeding No. 95–8205, consisting of the actions to recover the personal property owned by Taylor in the nursing home properties.

19. Both the eviction actions in Adversary Proceeding No. 95–8157 and the actions to recover the personal property in Adversary Proceeding No. 95–8205 were scheduled for trial before this Court for December 14, 1995.

20. On August 14, 1995, the Magnolia Entities filed a motion for a stay of the effect of the Court's findings of fact and conclusions of law against them in the Order and Judgment entered on May 26, 1995 in Adversary Proceeding No. 94–8202, pending their appeal of the Order and Judgment. On November 15, 1995, upon the posting of a supersedeas bond by the Magnolia Entities, the Court entered an order granting the motion for a stay pending the appeal pursuant to Rule 7062 of the Federal Rules of Bankruptcy Procedure.

21. Also on November 15, 1995, the Court entered orders granting to the Magnolia Entities a stay of the eviction actions in Adversary Proceeding No. 95–8157 and a stay of the actions to recover the personalty in Adversary Proceeding No. 95–8205 pending their appeal of the Order and Judgment of May 26, 1995 in Adversary Proceeding No. 94–8202. Pursuant to the stay orders, the Court canceled the trials of Adversary Proceeding Nos. 95–8157 and 95–8205 that were scheduled for December 14, 1995.

22. This case has also involved other litigation relating to the nursing homes. At the filing of Taylor's Chapter 11 petition, Taylor and Cash each owned fifty percent of the stock of Service Medical, Inc. ("SMI"), a pharmacy business providing pharmaceutical and other medical supplies to the nursing home facilities. On August 19, 1994, Cash, individually, and SMI, acting at Cash's direction as corporate president, filed Adversary Proceeding No. 94–8201 against Taylor alleging a breach of fiduciary duty by Taylor in matters relating to SMI. On August 22, 1994, Taylor filed Adversary Proceeding No. 94–8203 against Cash, alleging a breach of fiduciary duty by Cash in matters relating to SMI, and seeking a dissolution of the corporation. The two adversary proceedings were consolidated. The parties consented to the appointment of a receiver, and SMI was placed into a receivership by this Court's order and liquidated. On May 26, 1995, the Court entered its Order and Judgment in Adversary Proceeding Nos. 94–8201 and 94–8203, denying the claims of breach of fiduciary duty by both Taylor and Cash.

23. On September 13, 1994, Taylor filed a motion for authorization to use cash collateral consisting of the lease payments and rents from properties securing Taylor's creditors. The motion included the nursing home properties. Taylor and the creditors secured by the nursing homes reached agreements relating to the payment of the rent to the secured creditors. On October 4, 1994, the Court entered an order authorizing the use of cash collateral following the preliminary hearing on Taylor's motion, and on October 25, 1995, the Court entered an order authorizing the use of cash collateral following the final hearing on the motion. (Various other consent orders were subsequently entered to continue the terms of the cash collateral orders entered.) Pursuant to the terms of the cash collateral orders, for the period from September 1994 through January 1996, the lease payments made by the Magnolia Entities were paid directly to the

creditors secured by the nursing home properties, and a balance of $1,104.67 was remitted to Taylor each month as the amount in excess of the required cash collateral payments.

24. On May 16, 1995, NationsBank filed a motion to restrict Taylor's use of unencumbered funds. BB & T and the Magnolia Entities joined in NationsBank's motion. Consent orders governing the use of unencumbered funds were entered on August 2, 1995, and October 18, 1995. On November 27, 1995 the Court entered an order setting the allowed use of unencumbered funds, and on February 7, 1996 another consent order was entered setting the allowed use of unencumbered funds.

25. On June 23, 1995, the Magnolia Entities filed a motion to convert the case from Chapter 11 to Chapter 7 or, in the alternative, for the appointment of a trustee. Taylor filed an objection to the motion. On July 10, 1995, Taylor filed a plan of reorganization, whereupon the parties agreed to continue the hearing on the Magnolia Entities' motion to November 9, 1995.

26. On November 8, 1995, Taylor filed an *Addendum to Disclosure Statement,* and on November 13, 1995, he filed an *Amendment to Plan of Reorganization.* The Court conducted the hearing on the Disclosure Statement on November 9, 1995 and on November 16, 1995, entered its Order approving the Disclosure Statement, as amended by the Addendum. Subsequently, after making the decision to sell the nursing home properties, Taylor withdrew the Plan filed on July 10, 1995 and amended on November 13, 1995.[10]

27. Taylor's Plan filed on July 10, 1995 contemplated the removal of the Magnolia Entities from the nursing home properties, and the execution of new lease agreements with other parties who Taylor stated had expressed an interest in leasing the nursing home properties. Since November 1993, the Magnolia Entities have been paying $110,850.00 per month to Taylor as the rent they maintain is due to Taylor. These lease payments were not sufficient to pay the debt service required under the plan provisions stated in the Plan filed on July 10, 1995 and amended on November 13, 1995. In the Plan and Disclosure Statement, Taylor projected income from the proposed new leases at a higher level than the lease payments now made by the Magnolia Entities.

28. BB & T, the Magnolia Entities and NationsBank objected to Taylor's Disclosure Statement. Among its objections, BB & T argued that Taylor's proposed Plan was not feasible because he did not receive sufficient income from the Magnolia Entities to service the loans secured then by the nursing home properties,[11] and that it was unlikely that the litigation between Taylor and the Magnolia Entities would be resolved within a time to make the plan provisions feasible.

29. On October 16, 1995, BB & T filed a motion for the appointment of a trustee, or, in the alternative, an examiner pursuant to § 1104. Taylor objected to BB & T's motion. In its motion, BB & T cited the unresolved issues between Taylor and the Magnolia Entities, the continued diminution of the unencumbered assets of the estate, and issues relating to the confirmability of a Plan of Reorganization, as grounds for the appointment of a trustee in the case. The Court conducted the hearing on this motion alone with the Magnolia Entities' motion to convert the case or appoint a trustee on November 9, 1995 and November 13, 1995.

30. In its argument for the appointment of a trustee, BB & T expressed two primary concerns. First, BB & T argued that the Magnolia Entities' continued possession of the nursing home properties would result in Taylor receiving insufficient income to service the claims secured by such proper-

---

10. Taylor announced the withdrawal of the Plan at the December 6, 1995 hearing, at which time he advised the Court of his proposed settlement of BB & T's motion for relief from the automatic stay. He confirmed the withdrawal of the Plan by letter from his counsel dated January 2, 1996.

11. The loans secured by the nursing home properties have been since paid by the proceeds of the LTC loan.

ty, even on a restructured basis. Second, BB & T took the position that because Taylor is having to use and rely upon unencumbered assets to pay the costs of administration of the estate, his living expenses and debt service to creditors secured by non-income generating properties, the unencumbered assets of the estate would continue to decrease. BB & T argued that these two concerns created a situation of continuing diminution to the bankruptcy estate and coupled with the appeal of the Order and Judgment of May 26, 1995, and the litigation in the eviction actions successful reorganization seemed unlikely.

31. On February 6, 1996, the Court entered orders denying the Magnolia Entities' motion to convert Taylor's case, or, in the alternative, for the appointment of a trustee, and denying BB & T's motion for the appointment of a trustee, or, in the alternative, the appointment of an examiner.

32. On October 27, 1995, BB & T filed a motion for relief from the automatic stay pursuant to § 362(d) to allow it to proceed with foreclosure of its mortgages and liens on Taylor's nursing home properties. Taylor objected to the motion. On November 2, 1995, the Magnolia Entities filed their reply to BB & T's motion stating that their reply is a "Return and Joinder to the Motion".

33. Taylor and BB & T agreed to a proposed settlement of BB & T's motion for relief from the stay. On December 7, 1995, Taylor filed the *Notice and Motion Pursuant to Bankruptcy Rule 4001(d), and Notice of Sale Under 11 U.S.C. § 363*, stating the terms of the proposed settlement with BB & T, which included provisions for the possible sale of the properties. The Magnolia Entities objected to the proposed settlement. BB & T's loans were fully paid prior to the hearing on the objection, and the proposed settlement was withdrawn.

34. On October 10, 1995 Taylor filed a motion seeking authorization to obtain credit

and incur debt pursuant to §§ 364(c)(2) and (d) in order to refinance the secured claims on the nursing home properties in the form of a proposed loan from LTC Properties, Inc. ("LTC") in the amount of $11,250,000.00. The terms of the proposed loan were that LTC would be granted a first priority mortgage on the real estate and a first priority security interest and lien on the personalty of the five nursing home properties owned by Taylor and Berkeley, and that the mortgage granted to LTC would be senior in right, priority and interest to any leases of the nursing home properties. The proceeds of the LTC loan were to be used to satisfy the claims of the creditors then secured by the nursing home properties.

35. On November 1, 1995 and November 17, 1995, the Court entered orders authorizing Taylor to obtain the loan from LTC. The orders specifically provided that the LTC loan proceeds were to be used to satisfy the claims of the creditors secured by the nursing home properties, that LTC would be granted a first mortgage on the real estate and a first priority security interest and lien on the personal property relating to the nursing homes to secure the LTC loan, and that the mortgage securing the LTC loan would be senior in right, priority and interest to any leases of the nursing home properties.[12]

36. On December 5, 1995, Taylor filed a *Notice and Motion Pursuant to Bankruptcy Rule 4001(d)*, seeking an order granting LTC relief from the automatic stay as a part of LTC's loan to Taylor. The Magnolia Entities objected to this Notice and Motion. The parties settled this matter by the *Consent Order Granting LTC Properties, Inc. Relief from Automatic Stay*, which was entered on January 16, 1996.

37. On December 28, 1995, Taylor filed a motion for authorization under § 363(b)(1) to exercise his shareholder rights and powers under South Carolina law to dissolve Berkeley and to cause Berkeley to convey

---

**12.** The secured debt to be paid by the proceeds of the LTC loan was already senior to the leases on four of the five nursing home properties. Additional proceeds of the LTC loan in the approxi- mate amount of $600,000.00 were ordered escrowed in part to provide the Magnolia Entities with adequate protection that may result from the lease subordination in the fifth instance.

its assets to his bankruptcy estate, as a matter not in the ordinary course of business. On January 11, 1996, the Court entered its Order authorizing Taylor under § 363(b)(1), as the sole shareholder and officer of Berkeley, to dissolve Berkeley and to cause Berkeley to convey its assets to Taylor, as a matter not in the ordinary course of business. The Magnolia Entities have appealed this Order.

38. Also on December 28, 1995, Taylor filed a motion for an order to supplement the Orders entered on November 1, 1995 and November 17, 1995 authorizing the loan from LTC. In his motion, Taylor requested that the Court supplement the Orders of November 1, 1995 and November 17, 1995 in two areas. The first area concerned the authorization for the LTC loan. Subsequent to the entry of the two prior orders, Taylor and LTC negotiated an amendment of the terms of the LTC loan, which Taylor maintained were favorable and not materially adverse to the estate, and he requested that the Court confirm that the authorization for the LTC loan remained effective with these amendments. The second area concerned the subordination of the lease on the nursing home property in Moncks Corner, South Carolina to the LTC mortgage. The orders of November 1, 1995 and November 17, 1995 include the nursing home owned by Berkeley. As set forth above, by the Order entered on January 11, 1996, Taylor was authorized to dissolve Berkeley and to cause Berkeley to convey its assets, including the Moncks Corner nursing home property, to his bankruptcy estate. Taylor requested that the Court enter an order confirming the effectiveness of the subordination of the lease to the LTC mortgage on the Moncks Corner property, subsequent to the property becoming a part of the bankruptcy estate. On January 12, 1996, the Court entered its Order granting the motion. The Magnolia Entities have appealed this Order.

39. On or about January 31, 1996, the LTC loan closed.

40. On January 16, 1996, Taylor filed the Motion, and his *Memorandum in Support of Motion for Authorization to Sell Real and Personal Property Comprising Nursing Home Facilities Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* (the "Memorandum"). On January 17, 1996 Taylor's counsel filed a Certificate of Service concerning these filings. The Certificate of Service states that the Motion and Memorandum were served on Taylor's creditors and parties in interest, including counsel for the Magnolia Entities, on January 17, 1996.

41. Also on January 16, 1996, Taylor filed his *Notice of Sale of Property Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* (the "Notice of Sale"). The Certificate of Service filed on January 17, 1996 also states that the Notice of Sale was served on Taylor's creditors and parties in interest, including counsel for the Magnolia Entities, on January 17, 1996.

42. On January 25, 1996 after consultation with the litigants, this Court entered its Order scheduling a hearing on the Motion on March 11, 1996, setting the time for the filing of any objections to the Motion, and requiring that Taylor and any parties objecting to the Motion file joint stipulations as set forth in the Order.

43. On or about February 14, 1996, Taylor and the Magnolia Entities submitted a consent order to the Court extending the time for the Magnolia Entities to file their objection to the Motion from February 20, 1996 to February 27, 1996. The Court entered this order on February 15, 1996.

44. On February 16, 1996, Taylor filed his *Amendment to Motion for Authorization to Sell Real and Personal Property Comprising Nursing Home Facilities Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* (the "Amendment to Motion"). Attached to the Amendment to Motion is a copy of the Term Sheet for the proposed sale between Taylor and Delta Health Group, Inc. or its assigns. On February 20, 1996, Taylor's counsel filed a Certificate of Service stating that the Amendment to Motion was served on Taylor's creditors and parties in interest, in-

cluding counsel for the Magnolia Entities, on February 16, 1996.

45. Also on February 16, 1996, Taylor filed his *Amendment to Notice of Sale of Property Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* (the "Amendment to Notice of Sale"). Attached to the Amendment to Notice of Sale is a copy of the Term Sheet for the proposed sale between Taylor and Delta Health Group, Inc. or its assigns. The Certificate of Service filed on February 20, 1996 also states that the Amendment to Notice of Sale was served on Taylor's creditors and parties in interest, including counsel for the Magnolia Entities, on February 16, 1996.

46. On February 27, 1996, the Magnolia Entities filed their *Objection to Motion for Authorization to Sell Free and Clear and Memorandum in Support* (the "Objection"), and a Certificate of Service. The Certificate of Service states that the Objection was served on counsel for Taylor, LTC and Delta on February 27, 1996.

47. Also on February 27, 1996, NationsBank filed an objection to the Motion, but its objection relates to the preservation of the sale proceeds and not to the merits of the sale. It appears that NationsBank's objection has been resolved by Taylor's stipulation that the sale proceeds will be escrowed pending further order of the Court.

48. On March 5, 1996, Taylor filed his *Reply to Magnolia Entities' Objection to Motion for Authorization to Sell Properties Free and Clear* (the "Reply to Objection"), and a Certificate of Service. The Certificate of Service states that the Reply to Objection was served on counsel for the Magnolia Entities, NationsBank and Delta on March 5, 1996.

49. On March 8, 1996, Omega Healthcare Investors, Inc. ("Omega") filed its *Notice of Letter of Intent of Omega Healthcare Investors, Inc. and Response to Debtor's Motion for Authorization to Sell Real and Personal Property Comprising Nursing Homes Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* (the "Omega Notice and Response"). In the Omega Notice and Response, Omega states an offer to purchase Taylor's nursing home properties subject to the leases of the Magnolia Entities for a price of $12 million, subject to the terms and conditions stated in its proposed contract.

50. On March 26, 1996, Laurel Health Care Company ("Laurel") filed its *Notice of Interest by Laurel Health Care Company in Purchase of Certain Assets of Debtor* (the "Laurel Notice"). In the Laurel Notice, Laurel states that it would be interested in possibly bidding on the properties at the April 11, 1996 scheduled hearing but because it has had inadequate time to evaluate the competing offers, it was not in a position to submit a bid. On April 22, 1996, Laurel withdrew the Laurel Notice.

51. On March 26, 1996, the Magnolia Entities filed its *Notice of Intent to Offer* (the "Magnolia Notice"). In the Magnolia Notice, the Magnolia Entities states an offer to purchase Taylor's nursing home properties subject to the leases of the Magnolia Entities for a price of $18,290,000.00 which includes the assumption of the LTC debt of $11,250,000.00 and a credit bid of the value of its' leasehold interest in the amount of $7,040,000.00.

52. On March 29, 1996, Grancare South Carolina, Inc. and Grancare, Inc. (collectively "Grancare") filed *Grancare South Carolina, Inc.'s and Grancare, Inc.'s Notice of Intent to Purchase Debtor's Nursing Home Facilities* (the "Grancare Notice"). In the Grancare Notice, Grancare states an offer to purchase Taylor's nursing home properties for a cash price of $17,200,000.00 free and clear of the leases of the Magnolia Entities.

53. No other objections or competing offers were filed to the Motion.

54. On April 17, 1996, the Court held a continued hearing on the Motion to consider additional offers to purchase the nursing home properties. The four bids submitted at the hearing included the bids of Delta and Grancare to purchase the nursing home properties free and clear of the interest of the Magnolia Entities and the

bids of Omega Healthcare and the Magnolia Entities to purchase the nursing home properties subject to the leasehold interest of Magnolia.

55. At the April 17, 1996 hearing, the Debtor indicated that if the Court were to determine that the successful bid and therefore the sale would be subject to the Magnolia Entities' leasehold interests, he would withdraw the Motion. Therefore, the competitive bidding for a sale free and clear of the leasehold interests only included the offers of Delta and Grancare. As between Delta and Grancare, the final bid was $18.7 million by Grancare. At that time, the Debtor indicated his support of the Grancare offer as the highest and best offer.

56. The Debtor currently has no plan of reorganization or liquidation pending, and has not finalized plans as to how to distribute proceeds to creditors.

## CONCLUSIONS OF LAW

### A. Jurisdiction

■ The Magnolia Entities argue that this Court does not have jurisdiction to rule upon the Motion. Specifically, they argue that this Court is divested of jurisdiction over the matters in the Motion by virtue of the two appeals of the Order and Judgment entered on May 26, 1995 in Adversary Proceeding No. 94–8202, Taylor's appeal of the two stay orders in Adversary Proceeding No. 95–8157 and Adversary Proceeding No. 95–8205, and by the Magnolia Entities' two appeals of the orders entered on January 11, 1996 and January 12, 1996 in connection with the LTC loan. None of the appeals centrally involve the proposed sale of Taylor's nursing home properties under §§ 363(b)(1) and (f) and the Court finds that the appeals do not divest this Court of jurisdiction over the matters in Taylor's Motion.

■ The filing of a notice of appeal divests the lower court of its jurisdiction and control over the matters on appeal. *Marrese v. American Academy of Orthopaedic Surgeons,* 470 U.S. 373, 379, 105 S.Ct. 1327, 1331, 84 L.Ed.2d 274 (1985); *Griggs v. Provident Consumer Discount Company,* 459 U.S. 56,

58, 103 S.Ct. 400, 402, 74 L.Ed.2d 225 (1982) (The filing of a notice of appeal is an event of jurisdictional significance; it divests the lower court of jurisdiction over the matters involved in the appeal.); *In re Bryant,* 175 B.R. 9, 13 (W.D.Va.1994) ("A bankruptcy court is divested of jurisdiction with respect to matters raised in an appeal to a higher court."). However, a pending appeal of a bankruptcy decision does not deprive the bankruptcy court of jurisdiction over issues not involved in the appeal. *In re Schultz Mfg. Fabricating Co.,* 956 F.2d 686 (7th Cir. 1992), citing *Matter of Commodore Corp.,* 86 B.R. 564, 567 (Bkrtcy.N.D.Ind.1988). The determination of whether this Court has jurisdiction to rule upon the Motion rests upon whether the matters in Taylor's Motion are matters which are on appeal to the District Court.

In his Motion, Taylor requests that the Court authorize a sale of the nursing home properties pursuant to §§ 363(b)(1) and (f) free and clear of the asserted leasehold interests of the Magnolia Entities, upon the provision that, to the extent that such asserted interests are valid and enforceable interests, such interests shall attach to the proceeds of the sale of the property. Taylor does not request in the Motion that the Court adjudicate the issues of the validity and enforceability of the leases in connection with the proposed sale. To the contrary, Taylor relies principally upon § 363(f)(4), arguing that the Court should only determine that the asserted leasehold interests are in bona fide dispute. As a secondary basis for authorization of the sale, Taylor requests that the Court determine that the proposed sale price exceeds the aggregate value of all liens and interests on the properties and authorize the sale under § 363(f)(3). In seeking authorization under § 363(f)(3), Taylor does not request that the Court determine the validity and enforceability of the asserted leasehold interests; instead, he maintains that the Court should estimate the value of the interests, without adjudicating issues of default and termination of the interests.

As stated previously, the issues on appeal do not encompass the matters in Taylor's Motion. Initially, the two appeals of the

Order and Judgment in Adversary Proceeding No. 94–8202, the Declaratory Judgment action, involve this Court's determination of the rental rate due under the leases, the finding that the personalty of the nursing home properties is not included in the leases, the finding that the alleged non-compete agreements are not valid and enforceable, and the finding that other alleged "side-agreements" are not valid and enforceable. None of these matters are the subject of Taylor's Motion and accordingly these two appeals do not divest this Court of jurisdiction over the Motion. Also, Taylor's appeals of the orders granting the motion of the Magnolia Entities for a stay pending appeal in Adversary Proceeding No. 95–8157 and Adversary Proceeding No. 95–8205 involve Taylor's assertion that his eviction actions and actions to recover personal property from the nursing home properties should not be stayed pending the Magnolia Entities' appeal of the Order and Judgment in Adversary Proceeding No. 94–8202. The propriety of the stay pending appeal is not a matter involved in Taylor's Motion.[13]

The stay order is significant to the Motion only insofar as it explains why Taylor is precluded from pursuing the eviction actions and actions to recover the personalty at this time. These appeals do not divest this Court of jurisdiction over the Motion.

The Magnolia Entities' appeal of the Order entered by the Court on January 11, 1996 concerns this Court's authorization for Taylor to exercise his rights as the sole shareholder and officer of Berkeley Nursing Home, Inc. to dissolve Berkeley and cause it to convey its assets to his bankruptcy estate, as a matter not in the ordinary course of business under § 363(b)(1). The issue on appeal is whether the Court wrongly authorized Taylor to exercise shareholder rights not in the ordinary course of business not whether the rights existed or not. Without such order, Taylor's motion would likely have been filed in two cases rather than one without any material differing effect on Magnolia's rights. Therefore this appeal does not divest this Court of jurisdiction over the Motion.

Finally, the Magnolia Entities appeal the Court's order supplementing the two orders entered on November 1, 1995 and November 17, 1995 authorizing the LTC loan. The order of January 12, 1996 provides that the authorization for the LTC loan under the two prior orders remains effective for the LTC loan as amended, and confirms the provisions of the prior orders subordinating the lease of Magnolia Manor–Moncks Corner, Inc. to the LTC mortgage on the Moncks Corner property granted to secure the LTC loan.[14] The Order of January 12, 1996 thus involves authorization for the LTC loan and the subordination of the Magnolia Manor–Moncks Corner, Inc. lease of the Moncks Corner property to the LTC loan mortgage. These issues raised on appeal are not determinative of Taylor's Motion now before the Court. This appeal does not divest this Court of jurisdiction over the Motion.

The matters on appeal are not so related to a determination of whether authorization should be granted for the sale of the nursing home properties under §§ 363(b) and (f) as to preclude this Court's jurisdiction. To sustain the broad argument that the appeal of related issues deprives the Bankruptcy Court of jurisdiction to move forward with consideration of motions or plans on which reorganization is dependent could delay that process for years and potentially allow a single disgruntled party to appeal and thus defeat the means by which a debtor could timely reorganize. *See In re Julien Co.,* 117 B.R. 910, 919 (Bkrtcy.W.D.Tenn.1990) (allowing for jurisdiction for sale of property even during appeal).

---

**13.** Additionally, pursuant to Rule 8005 of the Federal Rules of Bankruptcy Procedure, the Bankruptcy Court has the inherent power to "make any other appropriate order during the pendency of an appeal on such terms as will protect the rights of all parties in interest," which would include the modification or termination of a stay pending appeal at any time.

**14.** The Order of January 12, 1996, noted that "The Magnolia Entities stated at the hearing on January 9, 1996 that they do not object to Taylor's request for a supplemental order confirming the effectiveness of the provisions of the prior orders subordinating the lease on the Moncks Corner nursing home property to the LTC mortgage."

The proposed sale of property of the bankruptcy estate is a core proceeding under 28 U.S.C. § 157(b)(2)(N) and (O), and this Court has jurisdiction over the proposed sale of property of the estate pursuant to 28 U.S.C. § 1334 and 11 U.S.C. § 363. *In re Octagon Roofing*, 123 B.R. 583, 589 (Bkrtcy.N.D.Ill. 1991). For all of the foregoing reasons, it is the finding of this Court that it has jurisdiction over the Motion.

### B. Sufficiency of Notice

■ The Magnolia Entities raised the objection at the hearing on March 11, 1996 that Taylor has not provided sufficient notice of his proposed sale to Delta for authorization under § 363(b), because Taylor and Delta did not execute the Agreement until on or about March 8, 1996.

Taylor filed the Motion and the Notice of Sale on January 16, 1996 and served these documents upon his creditors and parties in interest on January 17, 1996. The Motion, the Memorandum and the Notice of Sale state the proposed sale of the properties to Delta, the sale price, the legal bases under which authorization is sought for the sale, the asserted justification for the sale, and the proposed treatment of the creditors and parties asserting interests in the properties.[15] On January 25, 1996, the Court issued its Order scheduling the hearing on the Motion on March 11, 1996. On February 16, 1996, Taylor filed the Amendment to Motion and the Amendment to Notice of Sale, attaching a copy of the Term Sheet to each of these documents. Taylor served the Amendment to Motion and the Amendment to Notice of Sale on his creditors and parties in interest on February 16, 1996.

The Term Sheet states the material terms by which Delta would purchase the nursing home properties from Taylor. The Term Sheet stated the property to be sold, the purchase price, the manner in which the purchase price would be paid, the assumption of the LTC loan, the time for the closing of the loan, and contingencies relating to the sale (an order of this Court authorizing the sale, approval by LTC of the loan assumption, and approval by the State of South Carolina of the Certificate of Need and license for the continued operation of the properties as nursing homes). The Court holds that the Term Sheet provided adequate and proper notice of the terms of the sale to creditors and parties in interest.

Furthermore, the hearing on the sale was continued until April 17, 1996 at which time the Court considered bids of varying terms and conditions as submitted by four different bidders, including the Magnolia Entities.

At the conclusion of competitive bidding, the Debtor recommended the final bid of Grancare as the highest and best offer. Therefore the Court concludes that proper notice was given of the proposed sale, including the proposed terms of sale.

### C. Preconfirmation—Sale of Assets

■ The Magnolia Entities have objected to the sale upon the grounds that a sale of a substantial portion of a debtors assets should be made pursuant to a confirmed plan of reorganization so that all of the requirements of 11 U.S.C. § 1129 are applicable rather than through a preconfirmation motion to sell.

While the Court of Appeals of this Circuit has not definitely addressed this question, this Court agrees, as do many other courts, that there can be circumstances under which such a preconfirmation sale is appropriate.

■ The justification for and the standard to be used in allowing such a sale has been recently explained in Judge Bostetter's opinion in *In re WBQ Partnership*, 189 B.R. 97 (Bkrtcy.E.D.Va.1995):

> By its terms, § 363(b) does not require a Chapter 11 debtor to propose a plan of reorganization before it moves to sell its assets outside the ordinary course of business. Nevertheless, to prevent debtors from using § 363(b) as a vehicle for circumventing the creditor protections afforded under Chapter 11, the Courts have

---

15. The Motion and the Memorandum state that LTC *may* allow Delta to assume the LTC loan. The Amendment to Motion and the Amendment to Notice of Sale later state that Delta will assume the LTC loan as a part of the payment of its purchase price for the properties.

imposed their own requirements for allowing liquidation sales before plan confirmation . . .

More recent decisions have determined that pre-confirmation sales are permissible "when a sound business purpose dictates such action". *Stephens Indus., Inc. v. McClung,* 789 F.2d 386, 390 (6th Cir.1986) see also *Committee of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.),* 722 F.2d 1063, 1071 (2d Cir.1983).

. . . The sound business purpose test has four elements. A trustee or debtor-in-possession has the burden of proving that (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) the sale has been proposed in good faith; (3) adequate and reasonable notice of the sale has been provided to interested parties; and (4) the purchase price is fair and reasonable. *In re Delaware & Hudson Rwy. Co.,* 124 B.R. 169, 176 (D.Del.1991); see also *In re Country Manor of Kenton, Inc.,* 172 B.R. 217, 220 (Bankr.N.D.Ohio 1994); *Titusville Country Club v. Pennbank (In re Titusville Country Club),* 128 B.R. 396, 399 (Bankr.W.D.Pa.1991), p. 102.

*In re WBQ Partnership,* 189 B.R. at 102. *Also see In re The Lady H. Coal Company, Inc.,* 193 B.R. 233 (Bkrtcy.S.D.W.Va.) in which sound business purpose test is also adopted. This Court has previously approved preconfirmation sales on a consensual basis in *In re Guardian Fence Suppliers of S.C. Company,* a South Carolina Partnership, No. 92–75067 (Bkrtcy.D.S.C. 3/22/93) and in *In re Simpson Creek Development, Inc.,* No. 90–03836 (Bkrtcy.D.S.C. 11/27/91). In order to provide parties with a standard for consideration of such sales in the future, this Court formally adopts the sound business purpose test as the standard to be used in determining the appropriateness of preconfirmation sales of substantially all of a debtors assets in a Chapter 11 case.

In examining the elements of the sound business purpose test as they apply in the instant case, the Court has already determined that adequate and reasonable notice of the sale was provided to interested parties

and that the purchase price of 18.7 million dollars appears fair and reasonable as indicated by the competitive bidding that resulted at the April 17, 1996 hearing. Likewise, the Court is satisfied with the good faith of the proposed purchaser Grancare, the prevailing bidder who in large part came late to the sales process.

However, the most important remaining issues to be determined, and often the most critical, are whether a sound business reason or emergency exists to justify the preconfirmation sale and whether the sale is proposed by the Debtor in good faith. To support the motion, Taylor correctly notes that the reorganization case has been pending for over 18 months and continues to be mired in expensive and time consuming litigation with the lessees. Taylor also asserts that the present rent is insufficient to meet the new LTC mortgage payments. However, the Debtor in choosing the LTC loan (which was the subject of opposition by the lessees) to refinance its secured debt also set aside funds to cover any such insufficiency in rent for a period of approximately a year. At the hearing on the Motion, the Debtor noted this safeguard when he indicated his decision not to sell to bidders who sought to purchase subject to the leasehold interests, noting that such bids could be entertained at a later date.

Under these circumstances, the Court questions whether sufficient reasons exist at this time to circumvent the usual confirmation procedure. Considering further the consequences of such a sale on the leasehold interests absent any action by the Debtor to presently assume or reject the leases pursuant to § 365, a preconfirmation sale of these nursing home assets appears premature at this time. *See In re Country Manor of Kenton, Inc.,* 172 B.R. 217 (Bkrtcy.N.D.Ohio 1994) (denying preconfirmation sale of nursing home for failure to meet sound business purpose test). Therefore, the Court concludes that the Debtor has failed to meet the requirements of the sound business purpose test without the need to address the good faith of the Debtor in making the motion.[16]

---

**16.** In this Court's view, the bidding at the hearing on the Motion was beneficial in not only

delineating issues critical to a determination to the authorization of sale, but in demonstrating

### D. § 363 Sale of Property

To sell property free and clear of an interest in the property, the trustee or debtor-in-possession must satisfy the requirements of § 363(b) and 363(f).

Section 363(b) provides that following notice and a hearing a trustee or debtor-in-possession "may use, sell, or lease other than in the ordinary course of business property of the estate". In pertinent parts, § 363(f) provides as follows:

(f) The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate only if—

\* \* \* \* \* \*

(3) such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

(4) such interest is in bona fide dispute;
. . . .

### i. Property of the Estate

■ The Magnolia Entities initially object to the sale under § 363(b) upon the grounds that the Debtor is seeking to sell property which is not property of the estate. Sales of property under this section are limited to sales of property of the estate. *In re Signal Hill–Liberia Ave. Ltd. Partnership,* 189 B.R. 648 (Bkrtcy.E.D.Va.1995). Magnolia argues that by way of the leases, the Debtor conveyed leasehold estates to the lessees thereby dividing the interest in the property between the landlord and the tenant. As a result, the Magnolia Entities hold the leasehold estate and possession of the premises and Taylor only holds, as property of the estate, the reversion. 4 *Thompson on Real Property* § 39.03 at 495 (D. Thomas ed. 1994). Therefore the Debtor may only sell that reversionary interest. The Debtor responds that he is the title owner to the real estate, and has an interest in the properties consisting of not only the reversion, but also the right to receive income from the leases, the rights retained by the lessor under the

market interest and the value of the nursing homes; ultimate issues which appear certain to

leases, and the right to recover the property upon lessee default and termination of the leases. The Debtor asserts that this package of rights is property of the estate which can be sold and by utilizing § 363(f), that sale may include property interests held by other parties.

The definition of property of the estate in § 541 is broad and includes "all legal or equitable interests of the debtor in property as of the commencement of the case" wherever located and by whomever held.

In addressing § 541, one treatise states,

The debtor's interest in property also includes "title" to property, which is considered an interest in property just as a possessory interest or a leasehold interest would be. Similarly, if the debtor holds only an equitable interest in property without legal title, the estate acquires only the equitable interest of the debtor in possession's property and not the legal title. To the extent an interest is limited in the hands of the debtor, it is equally limited as property of the estate . . .

*Collier on Bankruptcy* § 541.06, 541–28. Also see *In re Todd,* 118 B.R. 432 (Bkrtcy. D.S.C.1989) holding "Section 541 is not intended to expand the debtors rights against others more than they existed at the commencement of the case." P. 435.

■ Clearly a lease of real property creates an estate in land that vests in the lessee. 2 *Collier on Bankruptcy,* ¶ 365.09 at 365–57 (15th ed. 1993). A leasehold and a reversion are separate estates in the same property. *Miller v. Lemon Tree Inn of Roanoke Rapids,* 32 N.C.App. 524, 233 S.E.2d 69 (1977). What is left in the lessor is the reversionary interest or remainder.

Because of the lease, in which the lessor earlier granted to the lessee the right to possession for a specified term, all that remains in the lessor at the time of bankruptcy is the reversionary interest. And because only the debtor's interest in property becomes property of the estate, the reversionary interest is all that is available

be critical to the reorganization of this Debtor.

for the estate to succeed to unless the lessee's rights and interests are somehow terminated, for example, under one of the avoiding powers.

Andrew, *Executory Contracts in Bankruptcy: Understanding "Rejection"*, 59 University of Colorado Law Review 845, 904–05 (1988). "A lease is partly the conveyance of an estate, which is deemed fully executed once the tenant takes possession. Therefore, the weight of authority is that the conveyance aspect of a lease may not ordinarily be unilaterally disturbed by a debtor landlord or his trustee." *Matter of Minges*, 602 F.2d 38, 41 (2d Cir.1979).

In addition to Magnolia's argument which is based on the separateness of the property interests of the lessor and lessees, other courts have conditioned authorization of sales which include interests associated with executory contracts or unexpired leases by their determination of the status of the unexpired leases or executory contracts themselves as property of the estate prior to assumption.[17]

In *N.L.R.B. v. Bildisco and Bildisco*, 465 U.S. 513, 546 n. 12, 104 S.Ct. 1188, 1206 n. 12, 79 L.Ed.2d 482 (1984), the Supreme Court held that prior to assumption or rejection "the terms of an executory contract are temporarily unenforceable against the debtor." Collier states that the estate does not take title to an executory contract or unexpired lease until it is affirmatively assumed, whereupon title relates back to the date of the filing of the bankruptcy petition. 2 *Collier on Bankruptcy*, ¶ 365 at 365–43 (15th ed. 1993).

In *In re Lovitt*, 757 F.2d 1035, 1041 (9th Cir.1985), the Court held that affirmative action of assumption is required to bring such property into the estate. Leases do not vest in trustee as of the date of the filing of the bankruptcy petition, but vest only upon the trustee's timely and affirmative act of assumption. *Also see In re Tonry*, 724 F.2d 467, 469 (5th Cir.1984); *In re Cochise College Park, Inc.*, 703 F.2d 1339, 1352 (9th Cir. 1983); *In re Northern Indiana Oil Co., Inc.*, 180 F.2d 669, 676 (7th Cir.), cert. den., 340 U.S. 824, 71 S.Ct. 58, 95 L.Ed. 605 (1950). *Also see In re Qintex Entertainment, Inc.*, 950 F.2d 1492 (9th Cir.1991) and *Turner v. Avery*, 947 F.2d 772 (5th Cir.1991).

To the contrary, the Bankruptcy Court for the Southern District of New York has noted that while some courts had held that executory contracts were not property of the estate prior to their assumption some of the same courts have nevertheless extended automatic stay protection to the debtor rights in the same executory contracts prior to assumption or rejection. With that in mind, Judge Brozman concluded that:

> Under the Code an executory contract (prior to assumption or rejection) is property of the estate protected by the automatic stay. *In re THW Enterprises, Inc.*, 89 B.R. 351, 354 (Bkrtcy.S.D.N.Y.1988). The better rationale was that espoused by the Supreme Court in *NLRB v. Bildisco and Bildisco*, 465 U.S. 513, 104 S.Ct. 1188, 79 L.Ed.2d 482 (1984), that is, that an executory contract is property of the estate but is unenforceable against the estate unless and until assumed.

*In re The Leslie Fay Companies, Inc.*, 166 B.R. 802 (Bkrtcy.S.D.N.Y.1994).

Finally one commentator noted that an unexpired lease or executory contract may be treated under four options: 1) it may be rejected, 2) it may be assumed and retained, 3) it may be assumed and assigned, or 4) it may "ride through" the bankruptcy process.

> . . . Arguably, there is a fourth alternative in Chapter 11 cases. Under the Bankruptcy act, the term "ride through" was used to describe a situation in which the debtor neither assumed, nor rejected a contract or lease. Under this ride through case law, the consequences of a debtor's failure to assume or reject were (1) the non-debtor had no claim in the case because there was no breach and (2) discharge did not affect the enforceability of the contract against the debtor. See, e.g., *Federal's Inc. v. Edmonton Investment Company*, 555 F.2d 577 (6th Cir.1977); *In re Alfar Dairy, Inc.*,

---

17. In this case, the debtor/landlord is not required to and has not made a decision to assume or reject the unexpired leases prior to a confirmation hearing. *In re Public Service Co. of New Hampshire*, 884 F.2d 11, 14 (1st Cir.1989).

458 F.2d 1258 (5th Cir.1972) cert. denied, 409 U.S. 1048, 93 S.Ct. 517, 34 L.Ed.2d 501 (1972), see generally Countryman, *Executory Contracts in Bankruptcy*, Part II, 58 Minn.L.Rev. 479, 561–63 (1974).

There are statements by way of dicta in Bankruptcy Code cases suggesting that the "ride through" concept continues. In his concurring and dissenting opinion in *Bildisco*, Justice Brennan wrote: "in the unlikely event that the contract is neither assumed nor rejected, it will 'ride through' the bankruptcy proceeding and be binding on the debtor even after a discharge is granted. The non-debtor party's claim will therefore survive the bankruptcy proceeding." *National Labor Relations Board v. Bildisco and Bildisco*, 465 U.S. 513, 546 n. 12, 104 S.Ct. 1188 [1206 n. 12], 1198 n. 12, 79 L.Ed.[2d] 482 (1984); see also *In re Greystone III Joint Venture*, 948 F.2d 134 (5th Cir.1991); *International Union v. Miles Machinery*, 34 B.R. 683, 687 (E.D.Mich.1982).

*David G. Epstein, et. al., Bankruptcy; Practitioner Treatise Series* ¶ 5–2, at 438 (1st ed. 1992).

After consideration of these various authorities, this Court believes that the Debtor's title to the real property as well as the package of rights the Debtor presently holds in regards to the unexpired leases (prior to any assumption or rejection) are sufficient property rights to meet the requirements of § 363(b) even if the property of the estate does not include the property rights of the lessees. Therefore, the Court will overrule Magnolia's argument that the requirements of § 363(b) are not met in this case. Once § 363(b) is considered, sale authorization would depend upon compliance with § 363(f).

### ii. Section 363(f)(3)

Under § 363(f)(3) the debtor in possession may sell property of the estate free and clear of any other entity's interest if such interest is a lien and the sales price is greater than the aggregate of all liens on the property. Under the facts of this case, this subsection sets forth a two part determination: are the leases liens and does the sale price exceed the total of liens. Taylor asserts that Magnolia's recorded leases amount to liens under this statute.

Section 101(37) defines a "lien" as a "charge against or interest in property to secure payment of a debt or performance of an obligation." The legislative history of § 101(37) reflects that the Code divides liens into three categories that are mutually exclusive: judicial liens, security interests, and statutory liens. The three categories are exhaustive except for certain common law liens. House Report No. 95–595, 95th Cong., 2nd Sess. 311–14 (1978). The only type of lien possibly applicable here would be a security interest which is defined in § 101(51) as a lien created by an agreement.

The contracts in issue in this case are true leases and not security agreements. None of the facts surrounding the leases imply that these leases are security agreements to be examined according to the factors mentioned in *In re Arthur*, 187 B.R. 502 (D.S.C.1995). The leases, despite being recorded, do not provide the lessees with collateral or an independent source of payment to be used in case of the failure in the principal obligation to pay or perform. The Debtor is incorrect that either the recording of the leases or the requirement to record as indicated by South Carolina Statute § 27–33–30, as recognized in *In re Dunes Hotel Associates*, 194 B.R. 967 (Bkrtcy.D.S.C.1995), enhances the leases status to that of liens under South Carolina law. The recorded leases may amount to a different type of enforceable encumbrance or interest in the title of the real property, but in this Court's view, the leases do not amount to liens under South Carolina law for purposes of § 363(f)(3). Therefore, the Debtor's use of this section for authorization to sell must fail and this Court need not determine whether the proposed sales price exceeds the aggregate of all liens.[18]

---

18. The parties' considerable efforts to present evidence indicating the value of the lease interests was not futile. While the Court declines to set a value at this time in as much as its unnecessary in this ruling the Court believes the lease interests do have considerable value and will ascribe a value when necessary in the case.

### iii. Section 363(f)(4)

Pursuant to § 363(f)(4), the debtor in possession may sell property of the estate free and clear of any entities interest in such property if ... such interest is in bona fide dispute. There are many cases which allow the sale of real property free and clear of liens on property which are in bona fide dispute. *In re Oneida Lake Development, Inc.,* 114 B.R. 352 (Bkrtcy.N.D.N.Y.1990), *In re Octagon Roofing,* 123 B.R. 583 (Bkrtcy. N.D.Ill.1991), *In re Milford Group, Inc.,* 150 B.R. 904 (Bkrtcy.M.D.Pa.1992). The precise issues to be considered by the Court under the Debtor's use of the subsection in this case are 1) whether the leases amount to interests in property of the estate and 2) whether such interests are in bona fide dispute.

As has been stated, the creation of the leases constituted a division of the real property into two interests; one retained by the landlord/owner, and the other by the lessees. The leases do in fact represent an interest in the real property and an encumbrance to title and ownership rights of the Debtor. While the leasehold interests do not amount to liens, they seem to fit within the broader term "interest" by any common definition.[19] As stated in *In re WBQ Partnership, supra:*

> Perhaps the more significant question is whether the term "interest" extends beyond liens ... Since "lien" is a defined term under the Bankruptcy Code, it stands to reason that Congress would have used the term "lien" instead of "interest," had it intended to restrict the scope of § 363(f) to liens. Furthermore, § 363(f)(3) applies to situations in which "such interest is a lien," which suggests that liens constitute a subcategory of "any interest." Other courts have indicated that the term "interest" is broad, covering more than mere liens. (citations omitted). We likewise conclude, for the reasons state above, that the term "interest" extends beyond liens.

*In re WBQ Partnership,* 189 B.R. at 105. Other courts have examined the application of the use of the term "interest" under the various subsections of 363(f) and regarding various types of property interests. *See In re Welker,* 163 B.R. 488 (Bkrtcy.N.D.Tex. 1994) (finding that 363(f) did not allow sale of real property subject to HUD's statutory and regulatory interest arising under agreement between the Debtor and HUD, because the Bankruptcy Code did not have priority over housing acts), *In re Dundee Equity Corp.,* 1992 WL 53743 (Bkrtcy.S.D.N.Y.1992) (finding that 363(f) did not allow sale of apartment building fee and clear of tenants rights under housing settlement agreement because such stipulations ran with the land and were enforceable against subsequent purchasers and therefore did not amount to a lien or an interest as contemplated by 363(f)), and *In re Manning,* 37 B.R. 755 (Bkrtcy.D.Colo.1984) (finding that a debtor's partnership interest did not represent an interest in the real property subject to the partnership agreement and therefore the interest in real property which was sought to be sold was not property of the estate under § 363(b) or (c) and that also a partner's interest in a partnership debtor is not "property of the estate" as defined in §§ 363(b) and 541).

*In re Wolverine Radio Co.,* 930 F.2d 1132 (6th Cir.1991) (finding that a debtors experience rating under the Michigan Employment Security Act was not an interest within meaning of § 363(f)), *In re 523 E. Fifth St. Housing Pres. Dev. Fund,* 79 B.R. 568 (Bkrtcy.S.D.N.Y.1987) (finding restrictive covenant in deed requiring real property to be used for low income housing was intended to run with the land and could not be rejected as executory contract and was not subject to money satisfaction under § 363(f)(5)), *In re Independence Village, Inc.,* 52 B.R. 715 (Bkrtcy.E.D.Mich.1985) (finding that sale of life care facility under § 363(f) could not avoid residents leases or life estates), *Gouveia v. Tazbir,* 37 F.3d 295 (7th Cir.1994) (finding that § 363(f)(5) did not allow sale of real property subject to restrictive use covenant because covenant was primarily in nature of a property interest intended to run with the land, even though it contained characteristics of both contract and an interest in real estate), *In re Owen–Johnson,* 118 B.R. 780 (Bkrtcy.S.D.Cal.1990) (denied sale under § 363(f)(4) as an attempt to avoid lis pendens

---

**19.** The term interest is not defined in the Bankruptcy Code.

filed against property primarily on benefit-to-estate theory).

On the other hand, certain types of "interests" have been found to be within the meaning of § 363(f). *See In re WBQ Partnership, supra, In re P.K.R. Convalescent Centers, Inc.,* 189 B.R. 90 (Bkrtcy.E.D.Va.1995) (allowing sale of nursing home assets under § 363(f)(5) over the interest of the Virginia Department of Medical Assistance to recover costs and depreciation reimbursements because such an interest is reducible to a claim and subject to a hypothetical money satisfaction), *In re All American of Ashburn, Inc.,* 56 B.R. 186 (Bkrtcy.N.D.Ga.1986) (confirmed sale of all of assets free and clear of product liability claims which arose prior to date of sale), *In re Rose,* 113 B.R. 534 (W.D.Mo. 1990) (allowed sale of real property free and clear of life estate interest under § 363(f)(1) and (4) with value of life estate to attach to proceeds), *In re Fleishman,* 138 B.R. 641 (Bkrtcy.D.Mass.1992) (finding that right of first refusal contained in a deed was executory contract rather than covenant running with land and therefore once covenant was rejected real property could be sold pursuant to § 363(f)), *In re Creative Restaurant Management, Inc.,* 141 B.R. 173 (Bkrtcy.W.D.Mo. 1992) (finding that any claim asserted by NLRB against the debtor for back pay or reinstatement was interest in estate property for purposes of § 363(f)).

From a review of these reported cases, there appears to be no consensus which controls the determination of whether an interest in property fits within § 363(f)(4). Since it appears that a leasehold interest is a type of "interest" that fits within the plan text of the § 363(f)(4) statute, the Court will consider this requirement met. However, the Court also notes that it could not locate any case law that allowed a sale of a leasehold interest under § 363(f)(4).

As to the second requirement under § 363(f)(4), it is the Debtor's obligation to demonstrate that there exists a bona fide dispute with respect to each of the leasehold interests. The phrase "bona fide dispute" is not defined in the Bankruptcy Code. Courts applying § 363(f)(4) have developed a standard for determining whether a "bona fide

dispute" exists; that is whether there is an objective basis for either a factual or legal dispute as to the validity of the asserted interest. This standard does not require that the Court resolve the underlying dispute or determine the probable outcome of the dispute, but merely whether one exists. *In re Collins,* 180 B.R. 447, 452 (Bkrtcy.E.D.Va. 1995) and *In re Octagon Roofing,* 123 B.R. 583, 590 (Bkrtcy.N.D.Ill.1991). Courts utilizing this definition have held the parties to an evidentiary standard; evidence must be provided to show factual grounds that there is an "objective basis" for the dispute. *In re Collins,* 180 B.R. at 452. However, not any alleged dispute satisfies the subsection. It clearly entails some sort of meritorious, existing conflict. *In re Atlas Machine & Iron Works v. Bethlehem Steel,* 986 F.2d 709 (4th Cir.1993).

The Debtor's primary basis for asserting a bona fide dispute is the alleged breach of the leases by the Magnolia Entities due to the failure to pay rent determined to be due under the leases by the Declaratory Judgment Order and due to a failure to pay taxes as called for by the leases. According to the Declaratory Judgment Order and based upon the stipulation between the parties, this Court found the Magnolia leases to be currently valid. This finding has not been appealed or adjudicated otherwise and therefore is presently the law of the case.

The alleged failure to pay the proper rent is based upon this Court's Declaratory Judgment Order in which it found that the October, 1992 cost of capital reimbursement rate was the proper rate referred to by the leases' rent clause.

Regarding the nonpayment of rent as a default, the leases in pertinent parts provide as follows:

### SECTION SIXTEEN

The following events constitute default:

(a) The nonpayment by LESSEE for a period of thirty (30) days of any sum required hereunder to be paid by LESSEE.

(b) The nonperformance by LESSEE of any other term, covenant, or condition of

this Lease which is not cured within thirty (30) days after written notice thereof from LESSOR.

### SECTION SEVENTEEN

On the occurrence of any of the events defined in Section Sixteen as constituting defaults, Lessor may without notice to or demand on LESSEE:

(a) Take possession of the demised premises and lease the same or any portion thereof, for such period and such rental, and to such persons, as LESSOR shall, in good faith, elect, and apply the proceeds of such renting, after deducting all costs and expenses incurred in connection with the recovery, repair and renting of the property, in payment of the rent and other obligations due from LESSEE to LESSOR hereunder, LESSEE remaining responsible for any deficiency.

(b) Take possession of the demised premises and sell it or any portion hereof at public or private sale, and apply the proceeds of any such sale, after deducting all costs and expenses incurred in connection with the recovery, repair and sale of the property, to any rentals and other obligations of LESSEE then due hereunder. If the proceeds, after the permitted deductions, are less than the obligations, LESSEE shall immediately pay LESSOR the difference.

(c) Terminate this Lease.

In his Complaint for Declaratory Judgment, the Debtor's primary assertion was that the leases along with certain other agreements provided him with a package of compensation higher than the amounts being paid him. The Court interpreted the leases to provide for a rent higher than that having been paid as rent but denied the enforceability of the other agreements. Taylor seeks to terminate the leases based primarily on a shortfall in rent payment.

Even if this Court were to determine that a shortfall in rent existed, under the reasoning of the South Carolina Supreme Court case of *Kiriakides v. United Artist Commu-*

*nications,* 312 S.C. 271, 440 S.E.2d 364 (1994) and general equitable principals, it is questionable whether such a failure to pay would serve retroactively as sufficient grounds for termination or forfeiture of the otherwise valid leaseholds, at least, before some assessment of the actual value paid to the Debtor is made and/or the lessees are given an opportunity to make payment or cure default. Furthermore, it is important to observe that in order to stay the ejectment litigation pending an appeal of the rent determination, the Court required the lessees to post a supersedeas bond which includes a large portion if not all of the amount alleged to be the shortfall in rent.

The Debtor's second ground of breach is the failure to pay taxes. Section Eight of the leases provides:

LESSEE shall pay all property taxes assessed and levied against the demised premises and improvements thereon and LESSEE shall pay all taxes or assessments which may be levied on the business conducted by LESSEE or personal property owned by LESSEE and used in LESSEE'S business. LESSEE agrees to deposit with LESSOR, on a monthly basis, an amount equal to $\frac{1}{12}$ of the prior year's property taxes to be applied toward payment of the property taxes.

The Debtor did not present any evidence that taxes have not been paid to the appropriate taxing authorities. Taylor asserts the failure to escrow taxes with him constitutes a sufficient default to put the leasehold interests in bona fide dispute. At this stage, this Court has sufficient doubt regarding this position to believe it fails to meet the requirements of § 363(f)(4) as they would apply to the leasehold interests.

Under the specific conditions of this case involving leasehold interests and based upon the Court's considerable familiarity of the issues, the Debtor has failed to meet his burden of persuading the Court that the issues between the Debtor and the Magnolia Entities constitute a bona fide dispute within the meaning of § 363(f)(4) and for purposes of presently authorizing the preconfirmation sale of the nursing home properties.

### E. Section 365 as Exclusive Remedy

 The Magnolia Entities further take the position that a debtor-lessor's sole remedy for relief from an unexpired lease is provided by § 365. Section 365(a) provides that a trustee or debtor in possession may assume or reject any executory contract or unexpired lease of the debtor subject to the approval of the Court. Under this provision a debtor is provided a statutory means and a time period to determine to shed itself of an unfavorable lease or solidify a favorable lease even to the extent of selling it, all for the benefit of a debtor's reorganization efforts. However, in the case of debtors who are landlords, Congress has specifically addressed its options in enacting § 365(h). Section 365(h)(1) provides in part as follows:

> If the trustee rejects an unexpired lease of real property of the debtor under which the debtor is the lessor, ... the lessee ... under such lease ... may treat such lease ... as terminated by such rejection, where the disaffirmance by the trustee amounts to such a breach as would entitle the lessee ... to treat such lease ... as terminated by virtue of its own terms, applicable non bankruptcy law, or other agreements the lessee ... has made with other parties; or in the alternative, the lessee ... may remain in possession of the leasehold ... interest under any lease ... the term of which has commenced for the balance of such term and for any renewal or extension of such term that is enforceable by such lessee ... under applicable nonbankruptcy law.

11 U.S.C. § 365(h)(1).[20] Therefore, if a lease is rejected under § 365(h), the lessee then has the option to treat the rejection as a breach or to remain in possession. The issue for this Court is whether the provisions of § 365(h) are the exclusive remedies of a debtor-lessor or whether a debtor-lessor can avail itself of the provisions of § 363 to remove the unexpired leases from property of the estate. The Debtor takes the position

that nothing in the express statute limits a debtor-lessor to § 365 and therefore § 363 may apply. At least one court has expressly found that the provisions of § 365 are exclusive. In the *In re LHD Realty Corp.*, 20 B.R. 717 (Bkrtcy.S.D.Ind.1982) opinion, which involved a debtor-in-possession which, as lessor, sought to terminate or modify a lease, the debtor urged the court to apply the doctrine of commercial impracticability and grant equitable relief. The court in finding that § 365 was the debtor's exclusive remedy, stated:

> It is the court's view that Congress' intent in enacting [§ 365] was to make that section the exclusive remedy available to a debtor in an executory lease situation. In the name of equity the court cannot disregard the plain language of § 365 and the mandate of Congress embodied therein.

*In re LHD Realty Corp.*, 20 B.R. at 719. *See also In re Robinson Truck Line, Inc.*, 47 B.R. 631 (Bkrtcy.N.D.Miss.1985) ("If 11 U.S.C. § 365 is the exclusive remedy for debtors faced with an unexpired lease within Chapter 11 proceedings, then it necessarily follows that it should also govern executory contracts within the context of a Chapter 11 plan").

Taylor takes the position that the *LHD* decision is distinguishable from the facts within as *LHD* involved a debtor-in-possession who sought to terminate or modify a lease, *while retaining ownership* of the property while this case involves a debtor-in-possession who seeks to sell property under §§ 363(b) and (f) and therefore the *LHD* holding, and the language quoted from the decision, were not meant to address the rights of a party under § 363(f). However, it appears to the Court that the *LHD* holding is consistent with the rule of statutory construction that specific legislation governs general legislation. As the *LHD* Court also held:

---

**20.** Effective October 22, 1994, The Bankruptcy Reform Act of 1994 amended 11 U.S.C. § 365(h). However, "[a]ccording to its drafters, the amendment is a clarification rather than a change of § 365(h). Therefore, the amendment may be used immediately in the determination of post- rejection lessees rights without regard to its effective date". Homburger, Gallagher and Rubel, *Conflict Resolved: Bankruptcy Code § 365(H) and the Contradictory Case Requiring its Amendment*, 29 Real Prop.Prob. & Tr.J. 869.

It is clear that Congress' intent was to afford the debtor the benefit of rejecting an undesirable lease while at the same time protecting the property rights of the lessee. See H.R. No. 95–595, 95th Cong., 2d Sess. (1977) 349; S.R. No. 95–989, 95th Cong., 2d Sess. (1978) 60, U.S.Code Cong. & Admin.News 1978, pp. 5787. Thus, "rejection of the lease results merely in the cancellation of covenants requiring performance in the future (e.g. the providing of utilities, repair and maintenance, janitorial services, etc., which LHD maintains are burdensome) by the debtor; rejection does not terminate the lease completely so as to divest the lessee of his estate in the property." 2 Collier on Bankruptcy, P 365.09 at pg. 354–43 (15th ed. 1979). *See In the Matter of Penn Central Transportation Company,* 458 F.Supp. 1346 (F.D.Penn. 1978); *In re 1438 Meridian Place, N.W. Inc.,* 11 B.R. 352, Bankr.L.Rep. P. 68,042 (Bkrtcy.D.C.1981).

*In re LHD Realty Corp.,* 20 B.R. at 719. Taylor argues that one possible result of such a finding would be that a debtor-lessor could successfully terminate a lease due to a default on the part of the lessee but lose the property through a foreclosure if the lessee appealed the termination order based upon the length of time required to complete the appeals. Taylor argues that § 363(f)(4) which allows a debtor to sell property free and clear on any interest in such property if such interest is in bona fide dispute, is designed to address this type of situation. For the following reasons, the Court must disagree.

Initially, § 365(h) specifically references the situation where the debtor is the lessor and *with great particularity* sets forth the rights and duties of the lessor and lessee while § 363 does not. Additionally, the legislative history regarding § 365 evinces a clear intent on the part of Congress to protect a tenant's estate when the landlord files bankruptcy:

> [t]hus, the tenant will not be deprived of his estate for the term for which he bargained.

Senate Report No. 95–989, 95th Cong., 2d Sess. (1978) 60 *reprinted in* 1978 U.S.Code Cong. & Admin.News 5787 at 5846. *Accord,* House Report No. 95–595, 95th Cong., 2d Sess. (1977) 349 *reprinted in* 1978 U.S.Code Cong. & Admin.News 5963 at 6306. To be able to circumvent the provisions of § 365 by alleging that a leasehold interest is in bona fide dispute (or even under other provisions of 363(f)) and therefore allow a sale free and clear of that interest pursuant to § 363(f)(4) would seem to be in direct contravention of the lessee protections specifically afforded by § 365.

> Certainly Congress did not intend for the courts to make distinctions between the "estate" and "contract" aspects of the lease. The difficulty involved in determining what was part of the tenant's "estate" was the very pre-Code problem § 365(h) was originally designed to avoid. The injustice to tenants that could result from the ability of the landlord to modify the terms of the lease was a motivating factor in the tenant protection built into § 365(h) by Congress.

Robert M. Zinman, *Landlord's Lease Rejection and the 1984 Amendments to § 365(h),* 13–MAR Am.Bankr.Inst.J. 16 (1994). In 1994, Congress further amended § 365(h) by The Bankruptcy Reform Act of 1994 to strengthen tenants rights to possession of their estates.

> Bankruptcy Act's 70(b), the predecessor to Bankruptcy Code § 365(h), provided that "[u]nless a lease of real property expressly otherwise provides, a rejection of the lease or of any covenant therein by the trustee of the lessor does not deprive the lessee of his estate." Section 70(b) was generally viewed as stating the dominant position that rejection did not terminate a lease, thereby protecting the innocent lessee who had relied on the stated term.

> With the enactment of § 365(h) of the Bankruptcy Code, Congress sought to effectively preserve the expectations of parties to real estate transactions by codifying the balance between the competing interests of the debtor-lessor and the lessee. Congress intended to prevent the divestiture of the lessee's estate prior to the expiration of the bargained-for term when the debtor-lessor rejects a lease. In es-

sence, § 365(h) is meant to prevent forcible evictions in all possible instances.

The 1994 amendment to § 365(h) removes [any] ambiguities and is intended to increase uniformity of lessee post-rejection rights by restricting bankruptcy courts' ability to deviate from the congressional intent of the 1984 amendment.

Homburger, Gallagher and Rubel, *Conflict Resolved: Bankruptcy Code § 365(H) and the Contradictory Case Requiring its Amendment,* 29 Real Prop.Prob. & Tr.J. 869.

This position was also reiterated in the Section-by-Section Analysis to the 1994 Amendments.

> This section clarifies section 365 of the Bankruptcy Code to mandate that lessees cannot have their rights stripped away if a debtor rejects its obligation as a lessor in bankruptcy. This section expressly provides guidance in the interpretation of the term "possession" in the context of the statute. The term has been interpreted by some courts in recent cases to be only a right of possession (citations omitted). This section will enable the lessees to retain its rights that appurtenant to its leasehold. The rights include the amount and timing of payment of rent or other amounts payable by the lessee, the right to use, possess, quiet enjoyment, sublet and assign.

Bankruptcy Reform Act of 1994, Section-by-Section Analysis, 140 Cong.Rec. H10752-01 (Oct. 4, 1994). To allow a sale free and clear of a leasehold interest pursuant to § 363 even if the lessee received the value of its interest from the proceeds would effectively provide a debtor-lessor with means of dispossessing the lessee, a result which would appear to be in contravention of Congressional intent.

This intent to limit a debtor-lessor's ability to effect a lessee's estate to § 365(h) has also been recognized in case law. In *In re Lee Road Partners, Ltd.,* 155 B.R. 55 (Bkrtcy. E.D.N.Y.1993) Judge Duberstein noted as follows:

> Section 70(b) of the Bankruptcy Act, the predecessor to § 365(h), provided that "[u]nless a lease of real property expressly otherwise provides, a rejection of the lease

or of any covenant therein by the trustee of the lessor does not deprive the lessee of his estate." According to Colliers on Bankruptcy, section 70(b) was 'really only declaratory of the prevailing view that a rejection of a lease does not of itself terminate the lease, but was regarded by the drafters as desirable in clarifying situations not often litigated and in protecting the innocent lessee who had based his affairs on the term provided in the lease." . . .

In enacting § 365(h), Congress sought to "codify a delicate balance between the rights of a debtor-lessor and the rights of its tenants, citing [*Stable*] *Sable Mews* [*Associates, Inc.*], 41 B.R. [594] at 594 [ (Bankr.S.D.N.Y.198) ], by preserving certain expectations of parties to real estate transactions. *In re Upland/Euclid,* 56 B.R. 250, 253 (9th Cir. BAP 1985). Specifically, Congress concluded that rejection of a lease by a debtor-lessor should not deprive a tenant of his estate for the term for which he bargained. H.R.Rep. No. 595, 95th Cong., 1st Sess. 349–350 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 60 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. *See also* Weintraub & Resnick, *Bankruptcy Law Manual,* ¶ 7.10[10] at 7–73 (1986).

Furthermore, courts· construing § 365(h) have concluded that the statute was designed to preserve a lessee's possessory interests in its leasehold while allowing a debtor-lessor to escape the burden of providing continuing services to a tenant. . . .

In accordance with the Code's intent that a tenant not be deprived of his estate for the term for which he bargained, *Solon Automated Servs., Inc. v. Georgetown of Kettering, Ltd. (In re Solon Automated Servs.),* 22 B.R. 312, 318 (Bankr.S.D.Ohio 1982), the lessee's leasehold estate cannot be diminished, changed or modified due to bankruptcy's intervention. . . .

In short, § 365(h) seeks to prevent forcible evictions whenever possible. *In re Carlton Restaurant, Inc.,* 151 B.R. 353, 356 (Bankr. E.D.Pa.1993).

*In re Lee Road Partners, Ltd.,* 155 B.R. at 60. Other courts have held that a sale of a property interest by a debtor-lessor to which an unexpired lease is related necessarily implies that the lease be assumed by the debtor. *In re Tleel,* 876 F.2d 769 (9th Cir.1989) and *Clark v. Pure,* 151 B.R. 75 (E.D.Pa. 1993).

The Court in *In re Qintex Entertainment, Inc., supra,* in denying the sale of an executory contract as part of a sale of assets under § 363 implied that § 365 is either an exclusive remedy or a necessary intermediate step before such a sale is available.

Also in an analogous decision, the Court in *In re Maxwell Newspapers, Inc.,* 981 F.2d 85 (2nd Cir.1992) stated that a debtor may sell the assets of its business under § 363 unencumbered by a collective bargaining agreement only if § 1113 has been satisfied. The Court in *In re Independence Village, supra,* held that the interests of life care residents could not be circumvented by a sale of the real property. According to the Court, if the interests held by the residents were leases, then a sale would include either an assumption of leases or the leases could be rejected but trigger § 365(h). The Court also denied the argument that the residents interests were saleable under § 363(f):

> ... we know of no authority permitting a remainderman to force a life tenant to cash out his interest.... The upshot of this discussion is that regardless of the nature of the residents' interests, the debtor may lack the power to oust the residents from possession of their respective units. Consequently, its sale of the property may leave the purchaser powerless to do so.

*In re Independence Village,* 52 B.R. at 734. *Also see In re Arden and Howe Associates, Ltd.,* 152 B.R. 971 (Bkrtcy.E.D.Cal.1993) (debtor-landlord may not *take* lessees leasehold interest but may reject its obligations under executory lease covenants) and *In re Chestnut Ridge Plaza Associates, L.P.,* 156 B.R. 477 (Bkrtcy.W.D.Pa.1993) (§ 365(h) was

enacted *to afford the lessee the option* of selecting the parameters of its claim in instance of rejection).

This strong recognition of a lessee's rights is also consistent with the view of many courts that even upon rejection the lessees' interest is not necessarily terminated. *See Matter of Austin Development Co.,* 19 F.3d 1077, 1082 (5th Cir.1994) and *In re Flagstaff Realty Associates,* 60 F.3d 1031 (3rd Cir. 1995).

Finally, this Court has not located nor did Taylor present any case authority which has approved a sale of a property interest free and clear of an unassumed or unrejected lease under § 363(f). Even though there appears no express statutory provision that excludes the use of § 363(f) by Taylor, in order to recognize the apparent intentions of drafters of the Bankruptcy Code as expressed so specifically in § 365(h), this Court agrees that § 365 is the necessary avenue which this Debtor must follow before this Court could authorize a transfer of the real property which Magnolia has leased.[21]

Finally, as a matter of state law, South Carolina Code Ann. § 27–35–50, while arguably including provisions to protect landlords from losing leases in the event of a sale of property subject to a lease, nevertheless requires the continuation of a lease interest upon a sale of property. This Court is not aware of any cases or procedure except the foreclosure of a previously recorded lien which under state law would allow a recorded lease to be terminated as a result of a sale or "cashed out" in a sale.

## CONCLUSION

It appears to the Court that Congress intended § 365(h) to control the rights of the landlord and the tenant when a landlord files bankruptcy and that § 365(h) reflects a careful balance between the needs of the bankrupt's estate and the rights of a tenant to the estate to which the tenant bargained. Fur-

---

21. This Court is not unsympathetic to the Debtor's dilemma of pursuing reorganization while issues that could lead to the termination of the leases remained stayed by an appeals bond. The Court notes some authority that would permit litigation of breach issues even after assumption of leases under § 365. *In re Orion Pictures Corp.,* 4 F.3d 1095, 1099 (2nd Cir.1993). Furthermore, alternative treatments of the leases may be provided in a plan of reorganization which still allow for further litigation of lease issues.

**168**

thermore, for the reasons stated, the Debtor's preconfirmation sale of the nursing homes does not meet the requirements of the Bankruptcy Code under § 363. Therefore the Court must deny the Debtor's Motion to Sell free and clear of the interests of the Magnolia Entities at the present time. For the reasons stated within, it is therefore,

**ORDERED,** that the *Motion for Authorization to Sell Real and Personal Property Comprising Nursing Home Facilities Free and Clear of All Liens, Encumbrances, Leases and Other Interests Pursuant to 11 U.S.C. §§ 363(b)(1) and (f)* is denied.

**AND IT IS SO ORDERED.**